[No. B153239. Second Dist., Div. One. Feb. 28, 2003.]

IB MELCHIOR, Plaintiff and Appellant, v.
NEW LINE PRODUCTIONS, INC., Defendant and Respondent.

**COUNSEL**

Law Offices of Donald L. Prichard, Donald L. Prichard; Regan•Braun Law Offices, James J. Regan, Lorne Lilienthal and Sheila Walsh for Plaintiff and Appellant.

Loeb & Loeb, Saul D. Brenner and Karen R. Thorland for Defendant and Respondent.

**OPINION**

**SPENCER, P. J.—**

INTRODUCTION

Plaintiff Ib Melchior appeals from a summary judgment in favor of defendant New Line Productions, Inc. He claims the trial court made errors of law which led to an erroneous grant of the summary judgment. We agree as to some of his claims of error and reverse the judgment in part.

FACTS[1]

On June 17, 1994, Ib Melchior (Melchior) and Mark W. Koch (Koch), on behalf of Prelude Pictures, Inc. (Prelude), executed a release agreement (Release Agreement). Prelude had optioned the rights to the motion picture Lost in Space (New Line Cinema 1998) (Picture). Issues had arisen between Prelude and Melchior regarding the rights to the Picture. The Release Agreement resolved these issues. Under the Release Agreement, Prelude was to make certain payments and grant certain privileges to Melchior. In exchange, Melchior gave up certain rights.

Specifically, Prelude agreed to pay Melchior $500 for entering into the Release Agreement. In addition, the Release Agreement provided that "[i]f the Picture gets made in association with Prelude, Prelude [granted to Melchior] . . . the right to receive seventy-five thousand dollars ($75,000) as a production bonus payable out of the budget of the Picture . . . and two percent (2%) of Prelude's gross receipts, if any, from the Picture (it being understood that such gross receipts are not the gross profits or receipts of the Picture or the distributor's gross but are Prelude's gross receipts from the Picture, including, without limitations, receipts from videocassettes, laserdiscs and other visual reproductions of the Picture . . .)."[2]

The Release Agreement further provided that "[i]f the Picture gets made in association with Prelude, Prelude shall grant to Melchior a non-exclusive 'special advisor to Mark Koch' or equivalent credit in the end titles of the Picture in a size, style, position and prominence to be determined by

---

[1]In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted, as well as those admitted and uncontested in the pleadings. (*Sacks v. FSR Brokerage, Inc.* (1992) 7 .Cal.App.4th 950, 962 [9 Cal.Rptr.2d 306]; *McDaniel v. Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 5 [269 Cal.Rptr. 196].) It is these facts only that we set forth and consider.

[2]"Gross receipts" had certain specified exclusions not relevant here. The Release Agreement provided additional payments for sequels or remakes, also not relevant here.

Prelude, in its sole and absolute discretion. Subject to Melchior's availability, Melchior shall be hired, and shall provide services to, Prelude for a period of a minimum of ten weeks during pre-production and/or production of the Picture at a salary of $1,500 per week." Prelude also would provide Melchior with complimentary passes to the Picture's premiere and a copy of the Picture on videocassette.

For an additional $500, Melchior released Prelude and others from any liability to him with respect to his work, Space Family Robinson. He granted Prelude the exclusive right to produce a feature length motion picture based on Space Family Robinson. Melchior also waived any rights he may have had under Civil Code section 1542. Further, without Prelude's consent, Melchior could not disclose the existence or terms of the Release Agreement.

The Release Agreement provided that no amendment or modification of the agreement would be valid unless in writing and signed by both parties. It provided that it "may be assigned or otherwise disposed of, or transferred by, [Prelude] and such assignee, disposee, or other transferee shall be bound by the terms of this agreement."

About August 5, 1994, Prelude entered into an agreement (New Line Agreement) with New Line Productions, Inc. (New Line) to sell to New Line Prelude's "rights to produce a feature-length motion picture . . . based on the television series 'LOST IN SPACE.'" Specifically, Prelude as seller "assign[ed] to [New Line as] Buyer all of Seller's right, title, and interest in and to the Property [the Picture], including, but not limited to, . . . Seller's right, title and interest pursuant to the release agreement dated June 15, 1994 between Seller and [plaintiff] . . . , a copy of which is attached as Exhibit B hereto. Buyer . . . expressly assume[d] all of Seller's obligations under the . . . Release Agreement, subject to the retained obligations of Seller with respect to the . . . Release Agreement, as set forth in the final sentence of paragraph 8 hereof."

The final sentence of paragraph 8 of the New Line Agreement provided "that with respect to the . . . Release Agreement, Seller retains the obligation to make all payments required to be made to Ib Melchior pursuant to such agreement: (i) a $75,000 production bonus if the Picture is produced . . . , (ii) 2% of Seller's gross receipts from the Picture, and (iii) a special advisor fee of $1,500 per week for a minimum of ten weeks during pre-production and/or production of the Picture; provided that Buyer has the right (upon notice to Seller) to make any of the foregoing payments directly to Ib Melchior and to offset such payments against monies payable to Seller hereunder."

The New Line Agreement provided for New Line to pay to Prelude a participation fee, "payable at such time, if ever, as the earlier" of two occurrences. One of these occurrences was "[w]hen domestic box office receipts for the Picture (as reported in Daily Variety) reach" $75 million, at which time a set participation fee would be paid to Prelude. (Emphasis omitted.) The other occurrence was "cash breakeven," at which time Prelude would be paid 5 percent of 100 percent of adjusted gross receipts.

Prelude did not inform Melchior of the New Line Agreement. Melchior did not agree in writing to the agreement.

New Line produced the Picture, Lost in Space. New Line paid Melchior $90,000: a $75,000 production bonus and $15,000 for services rendered. New Line also included a credit at the end of the picture, identifying Melchior as "Special Advisor to Mark Koch." Melchior was not paid, by Prelude or by New Line, an additional sum representing what would have been 2 percent of Prelude's gross receipts from the Picture.

The domestic box office receipts for the Picture, as reported by Daily Variety, never reached $75 million. The picture never reached cash breakeven. As a result, New Line never paid Prelude any participation fee under the New Line Agreement.

## PROCEDURAL BACKGROUND

Melchior filed this action against New Line and Prelude for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, constructive fraud, conversion, constructive trust and negligence. A first amended complaint contained the same causes of action. A second amended complaint added Koch and Ilitch/Koch Entertainment as defendants. It contained causes of action for breach of contract, declaratory relief, accounting, constructive trust, fraud and conspiracy, intentional interference with contractual relations, and money had and received.

New Line filed a demurrer to the second amended complaint. The trial court overruled the demurrer as to Melchior's causes of action for declaratory relief and accounting. It sustained the demurrer with leave to amend as to Melchior's causes of action for constructive trust, fraud and conspiracy,

and intentional interference with contractual relations. It sustained the demurrer without leave to amend as to the cause of action for money had and received.[3]

Melchior filed a third amended complaint containing causes of action against New Line for breach of contract, declaratory relief, accounting, intentional interference with contractual relations, conversion, unjust enrichment, negligent misrepresentation, intentional misrepresentation, and conspiracy. New Line filed a demurrer as to the causes of action for intentional interference with contractual relations, negligent misrepresentation, intentional misrepresentation and conspiracy. The trial court sustained the demurrer without leave to amend, leaving as the only causes of action against New Line breach of contract, declaratory relief, accounting, conversion and unjust enrichment.

Melchior filed a number of discovery motions and sought to compel New Line to produce further information. On July 17, 2001, the trial court deferred ruling on Melchior's last two motions until August 17. Two days later, New Line moved for summary judgment or, in the alternative, summary adjudication. On August 2, Melchior filed opposition to the summary judgment motion and requested a continuance of the motion.

The trial court heard New Line's summary judgment motion on August 16, 2001. It found Melchior's breach of contract cause of action had no merit as a matter of law, in that Melchior could not meet his burden of establishing a contract with New Line, which New Line breached to Melchior's detriment. It found Melchior's causes of action for declaratory relief and accounting had no merit as a matter of law, since they were based upon the existence of a valid contract with New Line. The trial court found Melchior's causes of action for conversion and unjust enrichment had no merit as a matter of law, in that they were preempted by the Copyright Act (17 U.S.C. § 101 et seq.) and barred by the releases in the Release Agreement. Additionally, unjust enrichment is not a valid cause of action under California law. The trial court accordingly granted the summary judgment motion and entered judgment in favor of New Line.

## CONTENTIONS

Melchior contends the trial court erred in granting summary judgment as to his causes of action for breach of contract, declaratory relief and accounting. Specifically, he claims that by law, when New Line accepted the

---

[3]The record does not reveal what, if anything, occurred with respect to Melchior's cause of action for breach of contract.

benefits of the Release Agreement, it also assumed the obligations of the agreement, including the obligations to pay Melchior the amounts due under the agreement. We agree that, by law, New Line assumed the obligations of the Release Agreement. The trial court therefore erred in adjudicating summarily these causes of action.

Melchior also contends that the parol evidence rule could not be used to exclude consideration of the Release Agreement when interpreting New Line's obligations under the New Line Agreement. Inasmuch as the summary judgment must be reversed as to the causes of action based on the agreements, we need not address this contention.

Melchior asserts the trial court erred in granting summary judgment on his causes of action for conversion and unjust enrichment, in that they are not preempted by the Copyright Act. He also argues that California law does not preclude his cause of action for unjust enrichment. We conclude his conversion cause of action is preempted by copyright law. In addition, Melchior has no cause of action for unjust enrichment under California law. The trial court thus did not err in adjudicating summarily these causes of action.

Melchior further asserts that his Civil Code section 1542 release, which precludes him from pursuing his cause of action for conversion, is void as against public policy and was not relied upon by the trial court. We need not address this assertion.

Finally, Melchior contends that, alternatively, the trial court should have granted his request to continue the hearing on the summary judgment motion, in that he was prevented from presenting evidence due to defendant's refusal to provide discovery. Again, we need not address this contention.

DISCUSSION

*Standard of Review*

The trial court properly grants summary judgment or adjudication if there is no question of fact and the issues raised by the pleadings may be decided as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) To secure summary judgment or adjudication, a moving defendant may show that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Aguilar, supra,* at p. 849.) Once the moving

defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of fact exists as to the cause of action or the defense thereto. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Aguilar, supra,* at p. 849.)

■ On appeal, we exercise our independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment or adjudication as a matter of law. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334-335 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) We must uphold the judgment or adjudication if it is correct on any ground, regardless of the reasons the trial court gave. (*Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1419 [267 Cal.Rptr. 819].)

*Breach of Contract, Declaratory Relief and Accounting*

The Release Agreement contained three major monetary provisions which took effect "[i]f the Picture gets made in association with Prelude." These were: (1) "the right to receive seventy-five thousand dollars ($75,000) as a production bonus payable out of the budget of the Picture"; (2) "two percent (2%) of Prelude's gross receipts, if any, from the Picture"; and (3) employment "for a period of a minimum of ten weeks during pre-production and/or production of the Picture at a salary of $1,500 per week." Melchior received the $75,000 production bonus and 10 weeks' employment at $15,000. He did not receive a sum representing what would have been 2 percent of Prelude's gross receipts, which became the basis of his lawsuit.

The subsequent New Line Agreement provided for New Line to pay to Prelude a participation fee, "payable at such time, if ever," as the domestic box office receipts for the picture reached $75 million or as the Picture reached cash breakeven. It also provided that Prelude "retains the obligation to make all payments required to be made to Ib Melchior pursuant to such agreement: (i) a $75,000 production bonus if the Picture is produced . . . , (ii) 2% of Seller's gross receipts from the Picture, and (iii) a special advisor fee of $1,500 per week for a minimum of ten weeks during pre-production and/or production of the Picture," although it gave New Line "the right (upon notice to [Prelude]) to make any of the foregoing payments directly to Ib Melchior and to offset such payments against monies payable to [Prelude] hereunder."

■ Melchior argues that the New Line Agreement improperly modified the Release Agreement by reducing the amount of receipts he was to receive from 2 percent of what would have been Prelude's gross receipts to 2 percent of Prelude's "participation fee" in the Picture without his written agreement

to the modification. He also claims that by accepting assignment of the benefits of the Release Agreement, New Line by law was required to accept the obligations of the Release Agreement, namely, the obligation to pay him the amount to which he was entitled under the Release Agreement.

Melchior relies on Civil Code section 1589 for the proposition that by accepting the benefits of the assignment of the Release Agreement, New Line also accepted the obligation under the agreement. That section provides: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." (*Ibid.*) Since New Line voluntarily accepted the benefit of the Release Agreement, by law it consented to the obligations arising under the Release Agreement.

*Fanning v. Yoland Productions, Inc.* (1957) 150 Cal.App.2d 444 [310 P.2d 85] is directly on point. In *Fanning*, actor Ronald Colman entered into a contract to provide services to Yoland Productions in the production of a motion picture. For his services, Yoland agreed to pay Colman a certain percentage of the picture's gross proceeds after $500,000 had been paid to the producer. Colman was to receive not less than $100,000; $25,000 one week after the start of principal photography and a guaranteed minimum of $75,000 from the gross proceeds of the picture. (*Id.*, at p. 446.)

Yoland assigned Colman's contract to producer Cardinal Pictures, Inc. Under the assignment agreement, Cardinal agreed to perform all of Yoland's obligations under the contract except payment of the minimum of $75,000 from the gross proceeds of the picture. Yoland agreed to remain liable for that obligation. The assignment agreement also made provision for payment of a portion of the net profits from the picture to Yoland. Colman consented to the assignment, although he was unaware that Yoland retained the obligation to pay him the $75,000 minimum. (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at pp. 446-447.)

Colman fully performed his part of the contract. Cardinal paid him the first $25,000 due under the contract. The picture was released. It did not have $500,000 in gross proceeds. Neither Cardinal nor Yoland paid Colman his $75,000. Colman assigned to the plaintiff his rights under the contract. (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at p. 447.)

The plaintiff sued Yoland and Cardinal. The trial court found that Cardinal, as assignee of Colman's employment contract, accepted the burdens of that contract as well as its benefits. It was estopped to set up as a defense the provisions of the assignment agreement excepting the obligation to pay

the $75,000 minimum. (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at p. 448.)

On appeal, Cardinal contended it was not liable for payment of the $75,000 minimum as a matter of law, in that the assignment agreement expressly provided it would not assume that obligation, and neither it nor Yoland intended that it would be liable for the payment. The court acknowledged that under the provisions of the assignment agreement, Cardinal did not assume the obligation to pay the $75,000 and Yoland agreed to retain the obligation. (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at p. 448.) It also acknowledged the general rule "that the mere assignment of rights under an executory contract does not cast upon the assignee any of the personal liabilities imposed by the contract upon the assignor." (*Ibid.*)

The court then noted the exception to the general rule set forth in Civil Code sections 1589 and 3521.[4] (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at p. 448.) It reviewed cases in which the exception had been applied to impose obligations on an assignee who had not assumed such obligations under the assignment agreement. (*Id.* at pp. 448-450.)

Turning to the case before it, the court pointed out that pursuant to the terms of Yoland's original contract with Colman and the assignment agreement, Cardinal made the picture utilizing Colman's services. Cardinal thus accepted the benefits of Colman's services under the original Yoland contract. (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at pp. 450-451.) "Under the provisions of section 1589 of the Civil Code, the acceptance by Cardinal of such benefits, under the circumstances here, is 'equivalent to a consent to all the obligations arising from' the employment contract between Colman and Yoland. Also under the provisions of section 3521 of the Civil Code, since Cardinal accepted such benefits from the employment contract, it must also bear the burdens of that contract. Notwithstanding the private arrangement between Cardinal and Yoland with respect to the nonliability of Cardinal for the guarantee, Cardinal is liable, under the circumstances here, for the $75,000 guarantee stated in the Yoland-Colman employment contract. The liability of Cardinal, under the circumstances here, is based upon principles of estoppel." (*Id.* at pp. 451-452.)

There is no meaningful distinction between the *Fanning* case and the case at bar. Pursuant to the terms of the Release Agreement and the New Line

---

[4]Civil Code section 3521 provides: "He who takes the benefit must bear the burden."

Agreement, New Line made the Picture utilizing Melchior's rights and services. New Line thus accepted the benefits of Melchior's rights and services under the original Release Agreement. (*Fanning v. Yoland Productions, Inc., supra,* 150 Cal.App.2d at pp. 450-451.) "Under the provisions of section 1589 of the Civil Code, the acceptance by [New Line] of such benefits, under the circumstances here, is 'equivalent to a consent to all the obligations arising from' the [Release Agreement] between [Melchior] and [Prelude]. Also under the provisions of section 3521 of the Civil Code, since [New Line] accepted such benefits from the [Release Agreement], it must also bear the burdens of that contract. Notwithstanding the private arrangement between [New Line] and [Prelude] with respect to the nonliability of [New Line] for the [payments to Melchior], [New Line] is liable, under the circumstances here, for the [payments] stated in the [Release Agreement]. The liability of [New Line] . . . is based upon principles of estoppel." (*Id.* at pp. 451-452.)

The case of *Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350 [61 Cal.Rptr.2d 742], in which this court reached a contrary result, is distinguishable and not controlling. In *Recorded Picture Company*, the defendant was not provided with a copy of the plaintiff's original contract. (*Id.,* at p. 358.) While it knew of the existence of the contract, it had no knowledge of the terms of the contract. (*Id.* at p. 365.) In addition, this court held the defendant was a licensee, not an assignee. (*Id.* at p. 363.) Here, by contrast, New Line was an assignee of the Release Agreement and had knowledge of its terms, making application of Civil Code section 1589 appropriate. New Line was well aware of the burdens of the Release Agreement when it accepted the benefits of that agreement.

Inasmuch as the trial court based the summary judgment as to Melchior's causes of action for breach of contract, declaratory relief and accounting on Melchior's inability to prove the elements of a breach of contract, starting with the existence of New Line's contractual obligations toward Melchior, the trial court erred in summarily adjudicating these causes of action. We therefore must reverse the judgment insofar as it summarily adjudicates these causes of action.[5]

---

[5]Based on this conclusion, we need not address Melchior's contention regarding the inapplicability of the parol evidence rule: that it did not bar consideration of the Release Agreement in determining the nature of the payment obligations under the New Line Agreement.

*Conversion and Unjust Enrichment*

 In his cause of action for conversion, Melchior alleged that he "was the creator and still is the owner of the property Lost in Space."[6] He alleged that he owned the rights to the Picture and the rights to 2 percent of the gross receipts from that Picture. Melchior alleged that New Line "took plaintiff's property and property rights concerning the motion picture Lost in Space including plaintiff's share of the gross profits described above and converted such property and property rights to [its] own use." Melchior demanded return of the converted property and property rights, but New Line refused to return the property, "i.e., the money, to plaintiff."

Melchior's cause of action for unjust enrichment was based upon New Line's having "obtained plaintiff's personal property, namely, the property Lost in Space; the rights pertaining to such property; and the Plaintiff's share of gross profits relating to the motion picture Lost in Space through mistake, fraud, [and] coercion." Melchior sought the amount of money New Line had been "unjustly enriched by unreasonably withholding and converting plaintiff's property."

 "A state law cause of action is preempted by the Copyright Act if two elements are present. First, the rights that a plaintiff asserts under state law must be 'rights that are equivalent' to those protected by the Copyright Act. [Citations.] Second, the work involved must fall within the 'subject matter' of the Copyright Act . . . . [Citation.]" (*Kodadek v. MTV Networks, Inc.* (9th Cir. 1998) 152 F.3d 1209, 1212.)

In *Kodadek v. MTV Networks, Inc.*, the plaintiff alleged that the defendant had been marketing a cartoon and other merchandise based on his drawings without his authorization. (*Kodadek, supra*, 152 F.3d at pp. 1212-1213.) Based on these allegations, he sought to set forth a state law claim for unfair competition. (*Id.* at p. 1213.) The court held the rights the plaintiff sought to assert under state law were the equivalent of rights protected under the Copyright Act—the rights to reproduce copyrighted work, to prepare derivative works, and to distribute those works to the public. (*Ibid.*) In addition, the work involved fell within the subject matter of the Copyright Act, which covers pictorial works. (*Ibid.*) Since both elements were present, the plaintiff's state law unfair competition claim was preempted by the Copyright Act. (*Ibid.*)

---

[6]We may examine the allegations of the complaint in order to define the issues of which the summary judgment disposes. (*Hooks v. Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 442 [165 Cal.Rptr. 741].) "The determination whether facts have been adduced . . . which present triable issues of fact is to be made in the light of the pleadings." (*Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 380 [121 Cal.Rptr. 768].)

In *Dielsi v. Falk* (C.D.Cal. 1996) 916 F.Supp. 985, the plaintiff sought to state a cause of action for conversion based upon defendants having converted his script to produce an episode of the *Columbo* television series. The court first noted that, "[g]enerally, the copying and distribution of literary intangible property does not state a claim for conversion." (*Id.*, at p. 992.) Conversion requires interference with tangible rather than intangible property. (*Ibid.*) Interference with intangible property would constitute plagiarism or misappropriation. (*Ibid.*)

In addition, the court concluded that the plaintiff's cause of action was preempted by the Copyright Act. The crucial allegation in the plaintiff's complaint was that the defendants wrongfully used and distributed a work authored by the plaintiff. (*Dielsi v. Falk, supra*, 916 F.Supp. at p. 992.) The allegation was equivalent to a copyright claim. (*Ibid.*)

Here, Melchior essentially alleged that New Line used work authored by him and distributed works derived therefrom to the public. Under *Kodadek* and *Dielsi*, these allegations are the equivalent of a copyright claim and the Copyright Act therefore preempts his cause of action for conversion. (*Kodadek v. MTV Networks, Inc., supra*, 152 F.3d at pp. 1212-1213; *Dielsi v. Falk, supra*, 916 F.Supp. at p. 992.)

Melchior seeks to distinguish the instant case from *Kodadek* and *Dielsi* on the ground that his cause of action for conversion is based not upon New Line's use of his work of authorship but upon New Line's "wrongful taking of money due him pursuant to a written agreement." He claims that "[i]ntangibles, if represented by a document, are subject to conversion." In certain instances, this is true. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 613, pp. 709-710; see, e.g., *Acme Paper Co. v. Goffstein* (1954) 125 Cal.App.2d 175, 179 [270 P.2d 505].)

This is not what Melchior alleged in his third amended complaint, however. Melchior alleged that New Line "took plaintiff's property and property rights concerning the motion picture <u>Lost in Space</u>." As previously stated, under *Kodadek* and *Dielsi*, these allegations are the equivalent of a copyright claim, subjecting Melchior's cause of action for conversion to preemption by the Copyright Act. (*Kodadek v. MTV Networks, Inc., supra*, 152 F.3d at pp. 1212-1213; *Dielsi v. Falk, supra*, 916 F.Supp. at p. 992.)

Melchior also argues that his conversion cause of action is not based upon conversion of the script for Lost in Space, which he acknowledges that he did not write, but is based upon "the original idea upon which the television series *'Lost in Space'* was based; that is the script for *'Space Family*

*Robinson.*'" Inasmuch as copyright protection does not extend to ideas, Melchior continues, the Copyright Act does not preempt his cause of action for conversion.

The tort of conversion does not apply to ideas. (See, e.g., *Minniear v. Tors* (1968) 266 Cal.App.2d 495, 501 [72 Cal.Rptr. 287]; 5 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 612-613, 709-710.) Moreover, the courts have held that copyright protection does, in fact, extend to ideas. (*Selby v. New Line Cinema Corp.* (C.D.Cal. 2000) 96 F.Supp.2d 1053, 1057-1059.) Melchior thus has no cause of action for conversion based upon defendant's use of his ideas.

Since Melchior's cause of action for unjust enrichment has the same basis as his cause of action for conversion, the Copyright Act also preempts it. (*Kodadek v. MTV Networks, Inc.*, *supra*, 152 F.3d at pp. 1212-1213; *Dielsi v. Falk*, *supra*, 916 F.Supp. at p. 992; see, e.g., *Del Madera Properties v. Rhodes and Gardner, Inc.* (9th Cir. 1987) 820 F.2d 973, 977.) In addition, as the trial court observed, there is no cause of action in California for unjust enrichment. "The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." (*Lauriedale Associates, Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448 [9 Cal.Rptr.2d 774].) Unjust enrichment is " 'a general principle, underlying various legal doctrines and remedies,' " rather than a remedy itself. (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1315 [265 Cal.Rptr. 525].) It is synonymous with restitution. (*Id.* at p. 1314.)

Melchior suggests he is entitled to restitution under a quasi-contract theory. He did not plead this theory of recovery, and he points to nothing in the record that suggests it was before the trial court in ruling on the summary judgment motion. It consequently cannot serve as a basis for reversing the summary judgment. (*Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830, 842 [71 Cal.Rptr.2d 817].) Moreover, Melchior cites no evidence or authority to demonstrate the existence of a triable issue of fact as to this theory, waiving any such claim. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 [35 Cal.Rptr.2d 574].)

*Civil Code Section 1542 Release*

Melchior asserts that his Civil Code section 1542 release, which precludes him from pursuing his cause of action for conversion, is void as against public policy and was not relied upon by the trial court. Inasmuch as the

Copyright Act otherwise preempts the cause of action, we need not address this assertion.

*Continuance*

Melchior claims the trial court abused its discretion in denying his motion for a continuance "based upon its erroneous conclusion that all of the claims were defective on their face and not susceptible to rehabilitation through further evidence or discovery." Under the circumstances, we need not address this contention.

The judgment is affirmed insofar as it summarily adjudicates the causes of action for conversion and unjust enrichment. Insofar as it summarily adjudicates the causes of action for breach of contract, declaratory relief and accounting, it is reversed. Melchior is to recover costs on appeal.

Ortega, J., and Mallano, J., concurred.