[No. A103456. First Dist., Div. Two. Oct. 21, 2004.]

RICHARD PAUL McBRIDE, Plaintiff and Appellant, v.
GARIANNE BOUGHTON et al., Defendants and Respondents.

■■■■■■■■■■■■■■■■■■■■■■■■

COUNSEL

Glassberg, Pollak & Associates and Ruth Elin Auerbach for Plaintiff and Appellant.

Mitchell, Brisso, Delaney & Vrieze, Nancy K. Delaney and Russell S. Gans for Defendant and Respondent.

OPINION

**RUVOLO, J.**— ■ This case calls upon us to decide, as a matter of first impression in this state, whether an unmarried man who has expended funds to support a child, in reliance on the mother's representation that he is the child's father, may sue the mother on an unjust enrichment theory for the return of the funds after discovering that the child is not his biological offspring. As a matter of public policy, we conclude that such a suit cannot be maintained. Accordingly, we affirm the trial court's judgment dismissing this case after sustaining the defendants' demurrer.

## I.

### FACTS AND PROCEDURAL BACKGROUND

Appellant Richard McBride was romantically involved with respondent Garianne Dashiell, then known as Garianne Boughton.[1] At some time during 1996, presumably in the fall, McBride moved to Chile. In December 1996, however, Boughton contacted him in Chile and informed him that she was pregnant with a child that she represented was his. Based on this representation, McBride returned to the United States and took a teaching job in order to support Boughton and the child.

---

[1] "Because this appeal is from a pretrial ruling sustaining demurrers without leave to amend, our recitation of the facts assumes the truth of all facts properly pleaded by the plaintiff-appellant [citations], and likewise accepts as true all facts that may be implied or inferred from those [he] expressly alleges. [Citation.]" (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 264 [130 Cal.Rptr.2d 601] (*Richelle L.*).) To avoid confusion, we will refer to respondent Garianne Boughton Dashiell as Boughton, and to respondent David Dashiell, who is alleged in the complaint to be the child's true biological father as well as Boughton's husband, as Dashiell.

The child, a girl, was apparently born on or about May 26, 1997.[2] During the month of May 1997, McBride and Boughton orally agreed that McBride would support Boughton for a year so that she could stay home and take care of the child. In June 1998, when the child was about a year old, Boughton began working again, and McBride resigned his job in order to become the child's full-time caregiver. It is not entirely clear from the complaint, but McBride and Boughton apparently lived together in the Los Angeles area during this time.

In December 1998, Boughton moved out of McBride's house, and told him, as alleged in the complaint, "that she would soon stop paying the bills, and that he would have to return to work." The child was not yet ready to adapt to day care, however, so McBride continued to act as her full-time caregiver for about another five or six months.

In May 1999, when the child was about two years old, McBride went back to work, taking a position as a flight attendant. In June 1999, McBride and Boughton agreed orally that McBride would have custody of the child 10 days each month. Nevertheless, in September 1999, Boughton told McBride that she was moving to San Francisco, evidently with the child, and that he would be able to see the child only two weekends a month. In October 1999, McBride filed a paternity proceeding seeking custody of the child, who was by then almost two and one-half years old.

In connection with the paternity proceeding, genetic tests were done, and the testing service reported that McBride was "excluded as the biological

---

[2] The child's date of birth is not given in the complaint, but was alleged by McBride in a paternity proceeding he filed in Los Angeles Superior Court on October 28, 1999. In support of their demurrers below, respondents requested that the trial court take judicial notice of certain documents filed in this paternity proceeding. Before filing their brief on this appeal, respondents moved to augment the record with their requests for judicial notice, as well as the documents of which they requested notice be taken.

Neither our record nor the motion to augment reflects whether McBride opposed respondents' requests for judicial notice in the trial court, or whether they were granted. Nonetheless, McBride did not oppose respondents' motion to augment the record in this court, and we hereby grant it. (See *Hansen v. Hansen* (2003) 114 Cal.App.4th 618, 621 [7 Cal.Rptr.3d 688] [granting unopposed motion to augment appellate record with documents filed in related judicial proceeding].) We also take judicial notice of the documents with which respondents have augmented the record. (See *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 501–502, fn. 3 [93 Cal.Rptr.2d 327, 993 P.2d 983] [judicially noticeable matter properly considered in ruling on demurrer, where relevant; Supreme Court took notice of local code provisions that trial court was requested to notice in connection with demurrer, despite lack of record of any ruling on such request by trial court]; Evid. Code, §§ 452, subd. (d)(1), 453, 459, subd. (a)(2).)

father of the child . . . ." McBride learned the results of the genetic tests in December 1999. Evidently, he then abandoned his efforts to seek custody of the child.[3]

On December 31, 2001, McBride filed the instant action seeking money damages against Boughton and Dashiell, who he alleges is the child's biological father. His original complaint alleged causes of action for intentional and negligent misrepresentation and for unjust enrichment, as well as a common count for money had and received. After respondents' demurrer was sustained with leave to amend, McBride filed a first and then a second amended complaint. Each of the amended complaints omitted the tort causes of action for intentional and negligent misrepresentation that had been included in the original complaint, pleading only unjust enrichment and a common count.[4]

Respondents demurred to both of McBride's amended complaints. The trial court sustained the demurrer to the second amended complaint, granting McBride leave to amend only for the limited purpose of stating a cause of action against Boughton for breach of contract. McBride did not file another amended complaint within the time allowed, so the trial court entered a judgment dismissing the action. This timely appeal followed.

## II.

### DISCUSSION

### A.

■ In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law. We also consider matters which may be judicially

---

[3] McBride's original complaint alleged that after the genetic tests established that he was not the child's biological father, he withdrew his custody claims. This allegation was not included in the second amended complaint, which was the operative pleading at the time judgment was entered. We are not sure why this allegation was omitted. In any event, it does not appear to be disputed that McBride is no longer pursuing any claimed right to play a parental role in the child's life.

[4] McBride does not argue on appeal that the trial court erred in sustaining respondents' demurrer with respect to his tort causes of action. (See *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1094 [8 Cal.Rptr.3d 233] [filing of amended complaint that omits previously pleaded cause of action as to which demurrer was sustained concedes defect in original pleading as to that cause of action].)

noticed. Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context, and ignoring erroneous or confusing labels if the complaint pleads facts which would entitle the plaintiff to relief. (*Richelle L.*, *supra*, 106 Cal.App.4th at p. 266; see also *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38–39 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479].) In short, our task is to determine whether the pleaded facts state a cause of action on any available legal theory.

## B.

McBride's second amended complaint includes two causes of action. The first is captioned as one for unjust enrichment. After incorporating the factual allegations summarized above, this cause of action avers that respondents were unjustly enriched by McBride's having paid for the care and support of Boughton and the child, because respondents "were legally responsible for the monies paid out by [McBride], and would have had to incur those expenses if [McBride] had not done so." The premise of this claim is that McBride's expenditures for the support of the child unjustly enriched respondents, as the child's biological parents, because McBride was not the child's biological father.

McBride's second cause of action is in the form of a common count for money had and received, alleging that respondents "became indebted to [McBride] for money paid, laid out and expended to or for defendants at defendants' special instance and request." This cause of action also alleges that Boughton promised in writing to repay the money McBride spent to care for her and the child, and failed and refused to make any payments.

The trial court sustained respondents' general demurrer to both of McBride's causes of action. In a written order, the court reasoned that "all purported causes of action as to [respondents] are precluded by applicable public policy," citing *Nagy v. Nagy* (1989) 210 Cal.App.3d 1262 [258 Cal.Rptr. 787] (*Nagy*).

To the extent that McBride's second cause of action was an attempt to plead a cause of action for breach of an express written contract, the trial court sustained a special demurrer for lack of particularity, but granted McBride leave to amend. As already noted, McBride failed to do so. "When a plaintiff elects not to amend after the court sustains a demurrer with leave to amend, we assume the complaint states as strong a case as possible, and

we will affirm the judgment if the unamended complaint is objectionable on any ground raised by the demurrer. [Citation.]" (*Gutkin v. University of Southern California* (2002) 101 Cal.App.4th 967, 981 [125 Cal.Rptr.2d 115], citing *Soliz v. Williams* (1999) 74 Cal.App.4th 577, 585 [88 Cal.Rptr.2d 184].) The record does not make clear whether McBride even intended to plead a cause of action for breach of an express contract, but on appeal, he does not argue that the trial court erred in sustaining the special demurrer. Thus, we deem McBride's contract claim, like his tort claims, to have been abandoned.[5]

## C.

In sustaining respondents' general demurrer, the trial court relied on *Nagy*, *supra*, 210 Cal.App.3d 1262. In *Nagy*, the plaintiff's estranged wife revealed during a deposition in their dissolution proceeding that the couple's child was not the plaintiff's biological offspring. The court held that the former husband's action against his former wife for fraud and intentional infliction of emotional distress was barred because, among other reasons, it would be contrary to public policy to allow a putative father to recover damages "for developing a close relationship with a child misrepresented to be his." (*Id.* at p. 1269.) The *Nagy* court placed the plaintiff's claims in the same category as " 'betrayal, brutal words, and heartless disregard of the feelings of others[, which] are beyond any effective legal remedy and any practical administration of law.' [Citation.]" (*Ibid.*)

Prior to the decision in *Nagy*, this division reached a similar result in *Richard P. v. Superior Court* (1988) 202 Cal.App.3d 1089 [249 Cal.Rptr. 246] (*Richard P.*). In *Richard P.*, the plaintiff was a married man, Gerald, who had separated from his wife. After the separation, the wife's lover, Richard, established that he was the biological father of the couple's children. Gerald then sued Richard, alleging that Richard had previously misrepresented to him that the children were biologically Gerald's, and had thereby induced Gerald to support them and develop a relationship with them. We held that Gerald's tort claims seeking damages for fraud and intentional infliction of emotional distress, on the basis of misrepresentations as to paternity, were barred by public policy (*id.* at pp. 1093–1096), reasoning that "the innocent

---

[5] We therefore do not address the question whether an express contract for the reimbursement of previously paid support, if arrived at under the circumstances of this case, would be unenforceable as against public policy. (But cf. *Dunkin v. Boskey* (2000) 82 Cal.App.4th 171 [98 Cal.Rptr.2d 44] [discussed *post*].) We note, however, that there is authority suggesting that the child's right to ongoing support could not be negotiated away by an agreement between her mother and her putative father. (See *In re Marriage of Crosby & Grooms* (2004) 116 Cal.App.4th 201, 210 [10 Cal.Rptr.3d 146]; *County of Shasta v. Caruthers* (1995) 31 Cal.App.4th 1838 [38 Cal.Rptr.2d 18].)

children here may suffer significant harm from having their family involved in litigation such as this[,] and . . . this is exactly the type of lawsuit which, if allowed to proceed, might result in more social damage than will occur if the courts decline to intervene." (*Id.* at p. 1094.)

*Richard P.* is not dispositive of the present case, however. As McBride's brief in the present case correctly points out, in a footnote in *Richard P.*, we expressly declined to "foreclose the possibility that a man in [McBride]'s position might be able to recover actual out of pocket costs incurred in supporting another man's child[] on an equitable theory for reimbursement, such as unjust enrichment." (*Richard P., supra,* 202 Cal.App.3d at p. 1096, fn. 3.) We expressly noted that the issue was not before us, and that we were not required to decide it. (*Ibid.*)

Citing the *Richard P.* footnote, McBride contends that *Nagy* is distinguishable because of the nature of the damages he is seeking, i.e., not general damages for the emotional impact of Boughton's conduct, but rather, reimbursement for the out-of-pocket expenses he incurred in contributing to the child's support—a relatively ascertainable and quantifiable form of damages that was not involved in *Nagy*, because the plaintiff in that case had waived any right to sue for them. (*Nagy, supra,* 210 Cal.App.3d at p. 1269.) Thus, this case calls upon us to decide the question we noted, but left open, in *Richard P.*

■ Whether respondents' demurrer to McBride's second amended complaint was properly sustained depends, however, not on the nature of the damages McBride seeks, but rather on the viability of the causes of action he has attempted to plead. The first cause of action is labeled as one for "unjust enrichment." Unjust enrichment is not a cause of action, however, or even a remedy, but rather " ' "a general principle, underlying various legal doctrines and remedies" ' . . . . [Citation.] It is synonymous with restitution. [Citation.]" (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793 [131 Cal.Rptr.2d 347].) Unjust enrichment has also been characterized as describing " 'the result of a failure to make restitution . . . .' " (*Dunkin, supra,* 82 Cal.App.4th at p. 198, fn. 15, quoting *Lauriedale Associates, Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448 [9 Cal.Rptr.2d 774] (*Lauriedale*).)

■ In reviewing a judgment of dismissal following the sustaining of a general demurrer, we ignore "[e]rroneous or confusing labels . . . if the complaint pleads facts which would entitle the plaintiff to relief. [Citation]." (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186]; accord, *Richelle L., supra,* 106 Cal.App.4th at p. 266.) Thus, we must look to the actual gravamen of McBride's complaint to determine what cause of action, if any, he stated, or could have stated if given leave to amend. In

accordance with this principle, we construe McBride's purported cause of action for unjust enrichment as an attempt to plead a cause of action giving rise to a right to restitution.

■ There are several potential bases for a cause of action seeking restitution. For example, restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason. (See generally 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, §§ 148–150, pp. 218–220; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 112, 118, pp. 137–138, 142–144.) Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct. In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory (an election referred to at common law as "waiving the tort and suing in assumpsit"). (See, e.g., *Murrish v. Industrial Indemnity Co.* (1986) 178 Cal.App.3d 1206, 1209 [224 Cal.Rptr. 308] [election to waive tort and sue in assumpsit is a fiction that broadens remedies available to plaintiff, but does not create a contract where none existed]; see generally 55 Cal.Jur.3d (May 2004) Restitution and Constructive Contracts, § 21.) In such cases, where appropriate, the law will imply a contract (or rather, a quasi-contract),[6] without regard to the parties' intent, in order to avoid unjust enrichment. (See generally 1 Witkin, Summary of Cal. Law, *supra*, Contracts, §§ 91, 95–96, 99–110, 116, pp. 122–123, 125–126, 128–136, 140–141; 3 Witkin, Cal. Procedure, *supra*, Actions, § 160, pp. 229–230; see also 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 517, pp. 607–608 [discussing use of common count to seek quasi-contractual restitution in lieu of tort damages].)

In the present case, neither McBride's complaint nor his briefs on appeal makes clear upon which of these theories his unjust enrichment claim is based. It clearly is not based on the existence of a contract that is unenforceable, however, because McBride has abandoned any claim that he and Boughton had an express contract. Thus, the only possible premise of

---

[6] "Quasi-contract" is simply another way of describing the basis for the equitable remedy of restitution when an unjust enrichment has occurred. Often called quantum meruit, it applies "[w]here one obtains a benefit which he may not justly retain . . . . The quasi-contract, or contract 'implied in law,' is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his former position by return of the thing or its equivalent in money." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 91, p. 122, italics omitted.) "The so-called 'contract implied in law' in reality is not a contract. [Citations.] 'Quasi-contracts, unlike true contracts, are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice.' [Citation.]" (*Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 794 [256 P.2d 947].)

McBride's cause of action for unjust enrichment is that he is entitled to restitution from Boughton on a quasi-contract or assumpsit theory based on her tortious conduct.

■ Under the law of restitution, "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.]" (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662 [15 Cal.Rptr.2d 173] (*First Nationwide*).) However, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it. [Citation.]" (*Id.* at p. 1663, italics in original; see also *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172 [114 Cal.Rptr.2d 109]; *Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 726 [91 Cal.Rptr.2d 881]; Rest., Restitution, § 1, com. c, p. 13.)

■ In keeping with the doctrine's focus on the *unjust* nature of the enrichment, "[i]t is well settled that restitution will be denied where application of the doctrine would involve a violation or frustration of the law or opposition to public policy. [Citations.]" (*Lauriedale, supra,* 7 Cal.App.4th at p. 1449.) Thus, "[d]etermining whether it is unjust for a person to retain a benefit may involve policy considerations. For example, if a person receives a benefit because of another's mistake, policy may dictate that the person making the mistake assume the risk of the error." (*First Nationwide Savings v. Perry, supra,* 11 Cal.App.4th at p. 1663.) Moreover, a person otherwise entitled to restitution may lose that entitlement if "restitution would seriously impair the protection intended to be afforded by common law or by statute to persons in the position of the transferee or of the beneficiary, or to other persons." (Rest., Restitution, § 62, p. 241.)

Applying these principles to the present case, we conclude that two of the most fundamental public policies of this state—the enforcement of parents' obligations to support their children, and the protection of children's interest in the stability of their family relationships (see, e.g., *In re Jesusa V.* (2004) 32 Cal.4th 588, 614, fn. 8 [10 Cal.Rptr.3d 205, 85 P.3d 2]; *County of Orange v. Leslie B.* (1993) 14 Cal.App.4th 976, 980 [17 Cal.Rptr.2d 797])—preclude us from requiring Boughton to make restitution to McBride based on his claim of unjust enrichment. Under circumstances such as those presented here, if we granted the former putative father the right to restitution from the child's biological parents, who retain responsibility for its support, we would give priority to the former putative father's desire to be made financially whole, to the potential detriment of the child's ongoing needs.

(Cf. Rest., Restitution, § 62, com. a, pp. 241–242 [situations in which restitution should not be ordered for public policy reasons include those where "the transferee is under the special protection of the law, a protection which would be weakened if restitution were permitted . . . ."].)

More importantly, at least from the child's perspective, by *declining* to recognize an unjust enrichment claim, we create a *dis*incentive for an unmarried man to form a parental bond with a child if the bond is likely to be severed upon the child's proving to be another man's genetic offspring. The potential emotional and psychic costs to the child of such a rupture are far more significant than any financial injury a grown man might suffer from mistakenly supporting another man's child for a temporary period.

These considerations were similarly of paramount importance in *Susan H. v. Jack S.* (1994) 30 Cal.App.4th 1435 [37 Cal.Rptr.2d 120], in which the court applied the conclusive presumption of husband's paternity[7] to reject a mother's paternity suit against a third party, despite proof that her husband was not the child's biological father. In doing so, the court supported its holding by relying on the child's interest in preserving the "palpable and formative familial relationship" (*id.* at p. 1443, fn. 5) established between the child and the mother's estranged husband, who had played a parental role for the first four years of the child's life: "The state has an 'interest in preserving and protecting the developed parent-child and sibling relationships which give young children social and emotional strength and stability.' [Citation.] This interest is served notwithstanding termination of the mother's marital relationship with the presumed father. ' "[I]n the case of an older child [over two years of age] the familial relationship between the child and the man purporting to be the child's father is considerably more palpable than the biological relationship of actual paternity. A man who has lived with a child, treating it as his son or daughter, has developed a relationship with the child that should not be lightly dissolved and upon which liability for continued responsibility to the child might be predicated. This social relationship is much more important, to the child at least, than a biological relationship of actual paternity . . . ." ' [Citation.]" (*Id.* at pp. 1442–1443.)

The Nebraska Supreme Court also made precisely this point in rejecting a similar unjust enrichment claim for past child support in *Day v. Heller* (2002) 264 Neb. 934 [653 N.W.2d 475]. In the words of that court, an "assumpsit claim that seeks to recover for the creation of a parent-child relationship has the effect of saying 'I wish you had never been born' to a

---

[7] This conclusive presumption was provided for in former Evidence Code section 621, subdivision (a). During the pendency of the appeal in *Susan H. v. Jack S., supra*, 30 Cal.App.4th 1435, former Evidence Code section 621 was recodified without substantive change as Family Code sections 7540 and 7541. (See *Susan H. v. Jack S.* at p. 1437, fn. 1.)

child who, before the revelation of biological fatherhood, was under the impression that he or she had a father who loved him or her. [Citation.] We decline to allow a party to use a[n] . . . assumpsit claim as a means for sending or reinforcing this message." (*Id.* at p. 479.)[8]

Moreover, our holding—that it is not unjust enrichment for a mother to retain child support she has received—serves an important public policy by sending the message to unmarried putative fathers that they should verify their paternity at an early stage if there is any doubt about the matter. Significantly, the Legislature has sent the same message to married men by providing a statutory incentive for them to resolve promptly any doubts they may have as to the paternity of their wives' children. Under the applicable statutory scheme, if a married man fails to request paternity testing within two years of the birth of a child to his wife, and he is neither infertile nor impotent, he will be conclusively presumed to be the child's father, with all the concomitant responsibilities as well as rights. (Fam. Code, §§ 7540, 7541; see *In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1444–1452 [53 Cal.Rptr.2d 439] [requiring husband to pay child support even though child was determined to be offspring of wife's lover, where biological tests were not done within two years of child's birth; rejecting constitutional challenge to statute making presumption of husband's paternity conclusive after two years]; see also *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 239–240 [71 Cal.Rptr.2d 399] [declining to allow married woman's lover to challenge husband's paternity; rejecting constitutional challenge to conclusive presumption].)

In addition, we note that determining whether Boughton was *unjustly* enriched would involve inquiring into the very subjects which *Nagy*, *supra*, 210 Cal.App.3d 1262, and *Richard P.*, *supra*, 202 Cal.App.3d 1089, held public policy requires courts to avoid. Issues of this type would include, but not be limited to: (1) the extent to which McBride's expenditures exclusively benefited the child, rather than Boughton personally, and if so, the effect of that fact on the equities of McBride's restitution claim against Boughton and Dashiell; (2) if restitution is owed, whether its amount should be reduced by the value of any benefit, emotional or financial,[9] that McBride received from

---

[8] *Day v. Heller, supra*, 653 N.W.2d 475, is the only out-of-state case our research has located that is precisely on point in rejecting a claim for restitution of child support premised on an unjust enrichment theory. One out-of-state case has been cited to us by the parties, but it is of limited relevance; in *Inez M. v. Nathan G.* (1982) 451 N.Y.S.2d 607, the court rejected an unmarried father's attempt to defend against a support claim in a paternity proceeding on the ground that the child's mother had misrepresented to him that she was using contraception.

[9] The complaint indicates on its face that there was a period of time during which McBride cared for the child while Boughton worked and "pa[id] the bills." Generally, "[t]he right of a person to restitution for a benefit conferred upon another in a transaction which is voidable for fraud . . . is dependent upon his return or offer to return to the other party anything which he

his relationship with the child; and (3) how, if at all, the equities of McBride's restitution claim may be affected by his decision to end his relationship with the child rather than pursuing any rights he may have had under Family Code section 7611, subdivision (d).[10]

Because of the lurking presence of issues such as these, we concur with the *Richard P.* court's concern that the "innocent child[] here may suffer significant harm from having [her] family involved in litigation . . . which, if allowed to proceed, might result in more social damage than will occur if the courts decline to intervene." (*Richard P.*, *supra*, 202 Cal.App.3d at p. 1094.) We recognize that *Richard P.* declined to consider whether this rationale would extend to a suit seeking only restitution for support paid rather than emotional distress damages, because the issue was not presented in that case. (*Id.* at p. 1096, fn. 3.) Having now considered it, in a case in which it is squarely presented, we have concluded that the type of harm to the child about which *Richard P.* expressed concern is as likely to be realized here as it was in that case.

In short, for much the same public policy reasons on which *Nagy* and *Richard P.* relied in declining to authorize a tort claim for the loss of a purported father's relationship with a child, we likewise decline to authorize a restitution remedy for support payments based on facts such as those pleaded in this case. Accordingly, we conclude that the trial court properly sustained respondents' demurrer to McBride's cause of action alleging unjust enrichment.

In reaching this conclusion, we have given due consideration to the opinion by Division One of this court in *Dunkin v. Boskey*, *supra*, 82 Cal.App.4th 171 (*Dunkin*). In *Dunkin*, our colleagues followed *Nagy* and *Richard P.* in disallowing damages for emotional distress based on the plaintiff's loss of a parental relationship with his nonbiological child. (*Id.* at pp. 193–195.) They went on to hold, however, that the plaintiff *could* recover his "readily ascertainable economic loss [i.e., the cost of supporting the child] under an unjust enrichment theory. [Citations.]" (*Id.* at p. 195.)

---

received as part of the transaction or . . . its value . . . ." (Rest., Restitution, § 65, p. 255.) Thus, in adjudicating McBride's unjust enrichment claim, the court would, at a minimum, have to determine whether he would be obligated to reimburse Boughton for her contributions to his support during that period.

[10] Recent case law under Family Code section 7611, subdivision (d) has accorded increased weight to the claims of men seeking recognition as the legal fathers of children who are not their biological offspring, at least where the biological father has not married the mother and established a relationship with the child. (See, e.g., *In re Jesusa V.*, *supra*, 32 Cal.4th 588; *In re Nicholas H.* (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932]; *In re Raphael P.* (2002) 97 Cal.App.4th 716 [118 Cal.Rptr.2d 610].)

*Dunkin* involved an express written contract between an infertile man (Dunkin) and a woman (Boskey), both unmarried, which granted Dunkin parental rights to a child that Boskey planned to conceive through artificial insemination from an anonymous donor. (*Dunkin, supra,* 82 Cal.App.4th at pp. 178–179.) When the child was about two years old, the pair became estranged, and Boskey moved away and refused to allow Dunkin to visit the child. Dunkin's suit to establish paternity and custody was dismissed for lack of standing. He then sued Boskey for breach of their contract. Boskey argued that the agreement was void and unenforceable as against public policy, and her demurrer was sustained.

On appeal, the court held that Dunkin and Boskey's contract did not "so offend[] public policy as to require us to find it illegal or invalid." (*Dunkin, supra,* 82 Cal.App.4th at p. 189; see also *id.* at p. 192.) Thus, although the contract could not "grant parental rights to [Dunkin] that the law otherwise expressly denies to him, infringe upon the authority of the court to provide for the appropriate custody and support of the child, or abridge the rights of the child, as between [Dunkin] and [Boskey] it is binding. [Citations.]" (*Id.* at p. 190.)

Turning to the issue of remedies, the court held that "[t]he preclusion of [Dunkin's] claim for general damages for emotional harm on public policy grounds does not operate to deny him recovery of special damages for readily ascertainable economic loss under an unjust enrichment theory. [Citations.]" (*Dunkin, supra,* 82 Cal.App.4th at p. 195.) In so holding, the court noted that "[a] contract unenforceable in its entirety for public policy reasons may still be enforced in part under compelling circumstances where the lawful and unlawful portions of the agreement may be separated. [Citations.]" (*Id.* at p. 196.) In the case before it, the *Dunkin* court reasoned, public policy only precluded enforcement of the contract by certain remedies—i.e., specific performance or damages for emotional harm—and that the relevant public policy considerations would not be contravened by an award of compensation for Dunkin's economic loss. (*Id.* at p. 197.)

Although *Dunkin* was decided in July 2000, well over a year before McBride filed his complaint in this case, the parties did not cite or discuss it either in the trial court or in their briefs on appeal. We accordingly requested supplemental letter briefs. Not surprisingly, McBride's supplemental briefs contend that *Dunkin* supports his position. Respondents' supplemental brief, on the other hand, argues that *Dunkin* is distinguishable. For the reasons we will explain, we concur in respondents' assessment.

The fact that McBride's claim is one for quasi-contractual restitution, arising from Boughton's alleged misrepresentations about his paternity,

sharply distinguishes the present case from *Dunkin*. In fact, from a public policy prospective, *Dunkin* presented the converse concern from that existing in the present case.

The *Dunkin* court recognized the possibility that requiring the defendant in that case to reimburse the plaintiff could "indirectly compromise the funds presently available to her for support." On the facts of the case before it, however, the court concluded that "the equities . . . and public policy considerations still fall in [the plaintiff]'s favor." (*Dunkin, supra,* 82 Cal.App.4th at p. 197.) The equities favored the plaintiff in *Dunkin* because he had voluntarily agreed to assume a support responsibility that he would not otherwise have had, in exchange for the opportunity to enjoy a parental relationship that was later unilaterally severed by the child's mother, in breach of her agreement. In this case, by contrast, McBride supported the child in the belief that he was her biological father (thus making it his legal responsibility to do so), without taking any steps to ascertain whether or not this was actually the case. On these facts, we believe the equities fall in the *child's* favor, and her interest in respondents' continuing ability to support her trumps McBride's interest in obtaining restitution.

Moreover, in *Dunkin*, the plaintiff was aware from the start that the child he agreed to support would *not* be biologically his, and his claim against the child's mother was not based on any misrepresentation to the contrary by her. Rather, his claim was based on the mother's breach of an express contractual promise to treat him as the child's father. Here, in contrast, McBride alleges that he agreed to support the child merely because Boughton told him that it *was* biologically his, and having found out that this was untrue, he is now asking the court to imply a quasi-contract giving rise to a right of restitution in his favor. For the reasons of public policy that we have already discussed, we decline to do so.

■ McBride's second amended complaint also includes a second cause of action framed as a common count for money had and received. A common count is not a specific cause of action, however; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness, including that arising from an alleged duty to make restitution under an assumpsit theory. (See *Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 14–15 [101 Cal.Rptr. 499]; see generally 4 Witkin, Cal. Procedure, *supra*, Pleading, §§ 514–518, 522(1), pp. 603–609, 612.) When a common count is used as an alternative way of seeking the same recovery demanded in a specific cause of action, and is based on the same facts, the common count is demurrable if the cause of action is demurrable. (See *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 459–460 [61 Cal.Rptr.2d 707]; *Zumbrun v. University of Southern California, supra,*

25 Cal.App.3d at p. 14; see 4 Witkin, Cal. Procedure, *supra*, Pleading, § 529, pp. 616–617.) Thus, in the present case, McBride's common count must stand or fall with his first cause of action, and we therefore uphold its dismissal for the same reasons.

McBride doubtless acted within his legal rights in relinquishing his paternal role when the child he had voluntarily cared for and supported proved not to be his biological offspring, and her biological father wished to assume responsibility for her. The effect of our holding in this case, however, is that if a man's willingness to parent his nonmarital partner's child is conditioned on its being his biological offspring, he proceeds at his own risk in failing to verify his paternity at an early stage in the child's life. A child does not come with a money-back guarantee of paternity. If it proves to be genetically unrelated to its putative father, our holding means that he will not be able to enlist the aid of the courts in seeking reimbursement from the child's biological parents for the contributions he has made to its support.

## III.

### DISPOSITION

The judgment of dismissal is affirmed.

Kline, P. J., and Haerle, J., concurred.