[No. B122789. Second Dist., Div. Four. June 9, 1999.]

SOUTH BAY BUILDING ENTERPRISES, INC., Plaintiff and Appellant,
v.
RIVIERA LEND-LEASE, INC., et al., Defendants and Respondents.

Knickerbocker Law Corporation and Richard L. Knickerbocker for Plaintiff and Appellant.

Phillip Kelly & Associates, Phillip Kelly; and Christopher Chun for Defendants and Respondents.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

Appellant South Bay Building Enterprises, Inc. (South Bay) and respondent Riviera Lend-Lease, Inc. (Riviera) are lending institutions. Each made loans to James Archer (Archer). Through deeds of trust, Archer gave each lender a security interest in his home in Palos Verdes Estates. Riviera recorded its security interest before South Bay. Riviera's security interest was approximately $127,000 and South Bay's was approximately $116,000.

Archer defaulted upon his obligations. Riviera exercised its rights as a secured lender and directed the holding of a nonjudicial foreclosure sale. At a sale held on February 4, 1992, Riviera was the only bidder. South Bay received no proceeds from that sale and its junior lien was extinguished. Riviera later sold the property.

South Bay brought suit against Archer, Riviera, the two owners of Riviera, and one of Riviera's managers. South Bay alleged defendants had engineered a fraudulent scheme to acquire Archer's property without having to pay South Bay.

At trial, South Bay's evidence established that defendants postponed the foreclosure sale several times in order to preclude others from bidding against Riviera; that at the first sale a potential buyer was present with a

$225,000 cashier's check; and that Riviera falsely represented that its security interest was larger than it actually was in order to deter other bidders.

Shortly before South Bay concluded its case, the trial court denied South Bay's motion to amend its complaint to conform to proof. After South Bay rested but before the matter was submitted to the jury, the trial court granted Riviera's motion for a directed verdict. This appeal by South Bay follows. We reverse. South Bay produced substantial evidence to support its case and it should be permitted to amend its complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Complaint*

Insofar as is relevant to this appeal, South Bay's complaint, filed in February 1995, asserted causes of action for fraud and conspiracy.

The fraud claim alleged: "Said defendants [Riviera, Archer, and Doe defendants] made representations of material fact that [Riviera] would proceed with a foreclosure sale [of Archer's property] and the overage from the sale after paying [Riviera's] obligation . . . would be paid to [South Bay]. [¶] . . . These representations were in fact false. The truth was said defendants . . . never intended to perform as they agreed, but instead used said agreement as a means of keeping [South Bay] from taking any action to enforce its lien on the real property . . . . [Riviera] repeatedly postponed said foreclosure sale at a time when there were bidders present, with sufficient cash available to pay [Riviera's] obligation, and instead directed the sale to take place at a time when there were no bidders present except [Riviera] which then proceeded to obtain said property and the sales proceeds at the foreclosure sale . . . by inflating its claim wrongfully. [¶] When defendants made the aforesaid representations, defendants, and each of them, knew they were false." The complaint then alleged the remaining elements of fraud: intent to defraud South Bay and reasonable reliance by South Bay.

The conspiracy claim alleged that from December 1990 through February 1992, "[Archer, Riviera, and Doe defendants] entered into an agreement and conspiracy to allow a foreclosure sale of [Archer's home] but never at a time whenever any responsible bidders were present, but only when [Riviera] was present as a prospective bidder. Whenever bidders were present, said defendants caused the foreclosure sale to be postponed. [¶] . . . [T]he purpose of said conspiracy was to permit the sale only to [Riviera] and thereby to prevent plaintiff from receiving any proceeds at said sale, and to thereby terminate any security interest plaintiff had . . . . [¶] . . . [S]aid foreclosure

sale was had in the manner planned by said conspirator defendants . . . on or about February 4, 1992 . . . depriv[ing South Bay] of its security interest [so that it] has in fact not obtained anything in payment of its obligation due from [Archer]."

South Bay subsequently named as Doe defendants Riviera's two owners (John Danis and David Clark) and one of Riviera's managers (Robert Hanaway).[1]

*Evidence Produced at Trial*

South Bay called as an adverse witness Robert Hanaway who worked as a manager for Riviera during the relevant time period. He conceded that pursuant to Archer's request, Riviera twice continued the foreclosure sale. Archer told Riviera that he wanted to "save" his house and that the money would soon be forthcoming to cure his default(s).

Hanaway identified the trustee only as a "foreclosure company." Hanaway explained that Riviera hired the trustee to conduct the foreclosure sale and that the trustee was Riviera's agent for purposes of the sale.

Hanaway and Archer were present at both aborted sales. The first sale was on December 31, 1991. One prospective bidder (Ronald Pole) appeared with a certified cashier's check for $225,000.[2] Hanaway postponed the sale. The second sale was "several weeks later." Because several bidders were present, Hanaway again decided to postpone the sale.

At trial, Hanaway was asked: "[W]hy[,] if a bidder did show up[,] would no sale be held if the purpose of the sale presumably is to attract bidders to buy the property?" Hanaway replied: "Because I had given Mr. Archer my word that we would hold the house for him and, therefore, if there was a bidder, we would cancel the sale at his request."

At a sale on February 4, 1992, no other bidder(s) appeared. Riviera bought the property. At that time, Archer owed Riviera $127,312.75. Riviera bid in at $225,487.03. Hanaway claimed the reason for the excessive bid was a failure to properly credit Archer for payments he had already made on his debt. When asked if this was a mistake, Hanaway replied: "Well, you can call it a mistake. It was more like it was a meaningless figure. It didn't

---

[1] The record does not explain why South Bay did not also sue the trustee who conducted the foreclosure sale.

[2] The check was entered into evidence at trial.

matter what the bid was because the sale was not going to go through because I had given my word to Mr. Archer that we would not—we would stop the sale so the bid meant nothing." Hanaway conceded that Riviera never paid the $225,487.03 sum it had bid; instead, Riviera simply "ended up getting the house." Hanaway denied that he and Archer "agreed that [Riviera] on purpose would inflate the amount . . . in order to detour [*sic*] other bidders." Hanaway admitted that he was aware of this error prior to the December 31, 1991, foreclosure sale but concluded that there was no reason to correct the error because under no circumstance was Riviera going to permit a third party to buy the realty at *any* trustee's sale.[3]

After obtaining the property, Riviera permitted Archer to continue to live in the home on the condition that he pay monthly rent of $7,100. Riviera used the rental proceeds to pay the three senior lienholders.[4] After approximately eight months, Archer stopped paying rent. Riviera evicted him from the house in February 1993. Using a real estate broker, Riviera sold the home for $800,000. Riviera's share of the sale proceeds, after payment of expenses, was $214,450.31. Nonetheless, Riviera claimed it suffered a net loss because prior to sale, it spent $129,058 to repair the property and it was owed $127,312.75 on its lien.

Archer's testimony confirmed that he and Hanaway had entered into an agreement vis-à-vis the foreclosure sales. Archer testified that they agreed "Riviera would conduct a foreclosure sale and not allow the foreclosure to go through until there were no bidders there and that way Riviera would have the property back and then they would resell it to me at some future date, or I would refinance it at some future date. In other words, if there were bidders, not allow them to bid at the foreclosure sale." Archer conceded he had been present at the two postponed foreclosure sales and that each sale was postponed because of his agreement with Hanaway.[5] On the issue of Riviera's inflated bid at the February 4, 1992, foreclosure sale, Archer contradicted Hanaway's testimony that the figure was simply a mistake. Archer testified: "Pleasantly to my surprise, Bob [Hanaway] had told me he

---

[3]Riviera's appellate brief claims "[t]he error in the amount of [its] full credit bid was due to a mere technicality" and "was an honest and harmless error."

[4]When Riviera later sold Archer's home to a third party, the following claims, in addition to those of Riviera and South Bay, were recorded: (1) $82,853 to Cal Fed on a first deed of trust; (2) $265,330 to Burlingame Mortgage on a second deed of trust; (3) $229,900 to Equitable Mortgage; (4) an IRS tax lien for $108,000; and (5) a Franchise Tax Board lien for $8,000.

[5]In regard to the second postponed foreclosure sale, Archer testified: "[T]here were a crowd of people, and I inquired when we called off the sale, I inquired of the other bidders, and inquired as to whether they had interest in that particular property. There was an interest, and I was—my knees were shaking."

had not reported the amount to the trustee because it would help inflate the price and cause bidders to stay away because the amount to require to give an opening bid would be larger." In response to the question: "No question in your mind this story about a mistake is just a made-up story," Archer responded: "No question whatsoever." From Archer's point of view, the inflated bid "would have a tendency to chill the bid, keep other people—if that had been the advertised amount, fewer people have $225,000 than those people that have a hundred twenty-five. Fewer people would obviously show." Archer testified that Hanaway told him about the inflated figure prior to the first (Dec. 1991) foreclosure sale.

South Bay originally named Archer as a defendant in the action. However, prior to trial he was dismissed from the action after he stipulated to entry of a $120,000 judgment against himself.

Clark and Danis, the two owners of Riviera, briefly testified. Neither was involved with the foreclosure sales but each essentially ratified Hanaway's actions taken in that regard.

*Motion to Amend Complaint to Conform to Proof*

Near the close of trial, South Bay moved to amend its complaint to conform to the evidence offered at trial. It sought to add two new causes of action.

The first was for money due under Civil Code section 2924k, subdivision (a).[6] The proposed amendment alleged: "The amount bid in at the foreclosure sale on February 4, 1992 was $225,487.03. This yielded an overage, over the amount legitimately owing to [Riviera] of $98,261.08 or thereabout. [¶] . . . The Riviera defendants should have caused that overage to have been distributed to the junior lienholder(s) as required by Civil Code § 2924k(a), but have not done so."

The second was for conversion. South Bay alleged: "The Riviera defendants have committed the tort of conversion, by retaining for themselves the

---

[6]Civil Code section 2924k, subdivision (a) provides: "(a) The trustee, or the clerk of the court upon order to the clerk pursuant to subdivision (d) of Section 2924j, shall distribute the proceeds, or a portion of the proceeds, as the case may be, of the trustee's sale conducted pursuant to Section 2924h in the following order of priority. [¶] (1) To the costs and expenses of exercising the power of sale and of sale, including the payment of the trustee's fees and attorney's fees permitted pursuant to subdivision (b) of Section 2924d and subdivision (b) of this section. [¶] (2) To the payment of the obligations secured by the deed of trust or mortgage which is the subject of the trustee's sale. [¶] (3) To satisfy the outstanding balance of obligations secured by any junior liens or encumbrances in the order of their priority. [¶] (4) To the trustor or the trustor's successor in interest. In the event the property is sold or transferred to another, to the vested owner of record at the time of the trustee's sale. . . ."

overage resulting from the foreclosure sale on February 4, 1992 and refusing to account to the plaintiff for it."

Defense counsel opposed South Bay's motion. He argued that he had not had an opportunity either to perform legal research on the merits of those claims or to conduct discovery on the pertinent points.

The court denied South Bay's motion. It found the motion untimely and that its grant would prejudice defendants.

*Motion for a Directed Verdict*

After both parties had rested,[7] the defense successfully moved for a directed verdict.

In regard to the fraud claim, the defense noted that the essence of the claim as pled in the complaint was the assertion that defendants had fraudulently misrepresented *to South Bay* that it would conduct a proper foreclosure sale and remit any overage payment to South Bay and that South Bay had relied to its detriment on that misrepresentation. The defense pointed out, and South Bay's counsel agreed that, although Willard Anderson, South Bay's owner, had testified, he never claimed that Riviera ever made any representations *to him* about the pending foreclosure sale.[8]

The court ruled: "I will have to agree with defendants, then, that their motion for directed verdict should be granted as to the third cause of action for fraud in that there has not been any evidence of a false statement of fact or representation to the plaintiff [South Bay] upon which plaintiff relied and his action was induced. The elements simply have not been established."

As for the conspiracy claim, the court noted that because the fraud claim alleged in the other count had not been established, there could be no showing that there had been a conspiracy to commit that fraud. South Bay's attorney then urged that it was really a conspiracy to commit conversion in that defendants conspired to avoid distributing to South Bay the funds generated by Riviera's $225,487.03 bid.

---

[7]South Bay's brief incorrectly states that the trial court ruled upon the motion prior to the defense case. Not so. There was no defense case. After South Bay completed its case-in-chief, the court asked defense counsel: "Does the defense wish to call any witnesses?" Counsel replied: "No, Your Honor. Defendant rests." Thereafter, the motion for a directed verdict was argued and ruled upon.

[8]Anderson testified he did not learn about the February 1992 foreclosure sale until after the sale had been conducted.

The court ruled against South Bay. It stated, in part: "[T]here is no evidence at the trial . . . that the defendants had property which belonged to the plaintiff but refused to pay that property over to or give it over to the plaintiff. Conversion must be distinguished from a breach of a duty to pay. And what plaintiff is asserting here is that the defendants had a duty to deposit all of the funds at the time of the foreclosure sale with the trustee, and that the trustee then should have paid it over to the various lien holders. . . . So the theory that's been advanced is not . . . that the defendants actually had property that was belonging to or that the right of possession existed in the plaintiff, but, rather, that the defendants breached a duty to pay that over [to the trustee]. I'm afraid it just doesn't come within the elements of conversion which require that the plaintiff either own the property or had the right to possess the property at the time that the defendant interfered with the property by failing or refusing to give it over to the plaintiff."

The court concluded: "[U]nder the theories that are advanced in the complaint and supported by the evidence that's been introduced here at trial, I'm granting the defendant's motion for directed verdict as to both causes of action."

*Motion for a New Trial*

South Bay moved for a new trial, contending that the court erred in denying its motion to amend the complaint and in granting a directed verdict for defendants. The trial court denied the motion.

This appeal by South Bay follows.

### DISCUSSION

When, as here, an appeal is taken from a judgment entered upon a directed verdict, we must view the evidence in the light *most favorable to the appellant* (South Bay). All inferences must be drawn in appellant's favor. If we find legal merit to appellant's claim and substantial evidence to support that claim, we are required to reverse the trial court. (*Colbaugh* v. *Hartline* (1994) 29 Cal.App.4th 1516, 1521 [35 Cal.Rptr.2d 213].) At bench, statutory and decisional law supports South Bay's claim and South Bay produced substantial evidence to prove its claim. We therefore reverse.

When a debtor (Archer) defaults on a secured real property loan, the lender beneficiary (Riviera) may institute nonjudicial foreclosure proceedings to trigger a trustee's sale of the realty to satisfy the obligation. (Civ.

Code, § 2924 et seq.) The beneficiary, like any other party, may bid cash, offering more or less than the balance due on the debt. (See, e.g., *Pacific Inland Bank* v. *Ainsworth* (1995) 41 Cal.App.4th 277, 280 [48 Cal.Rptr.2d 489].) A junior lien (South Bay) will be extinguished at the foreclosure sale unless the successful bidder purchases at a price sufficiently high to pay off both the senior lien *and* the junior lien. (*FPCI RE-HAB 01* v. *E & G Investments, Ltd.* (1989) 207 Cal.App.3d 1018, 1023 [255 Cal.Rptr. 157].) Traditionally, when there is a claim of irregularities in a foreclosure sale, the remedy is to move to set aside the sale. (4 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 9:154, pp. 505-506.) However, that is not the exclusive remedy. Fraudulent actions taken by the beneficiary can give rise to liability in tort. "When the property has been sold to a bona fide purchaser, even though the sale cannot be avoided, the trustor or a junior lienor . . . retain[s] the right to recover damages from the trustee and the beneficiary of the foreclosing lien if there have been material irregularities in the conduct of the foreclosure." (*Id.*. at p. 517, fn. omitted.)

Of particular significance to this case is the fact that an individual can incur criminal liability for committing the acts done by defendants. Civil Code section 2924h, subdivision (g) provides that it is "unlawful for any person, acting alone or in concert with others, (1) to offer to accept or accept from another, any consideration of any type not to bid, or (2) to fix or restrain bidding in any manner, at a sale of property conducted pursuant to a power of sale in a deed of trust or mortgage. . . . [¶] In addition to any other remedies, any person committing any act declared unlawful by this subdivision or any act which would operate as a fraud or deceit upon any beneficiary, trustor, or junior lienor shall, upon conviction, be fined not more than [$10,000] or imprisoned in the county jail for not more than one year, or be punished by both that fine and imprisonment."

This case is factually similar to *FPCI RE-HAB 01* v. *E & G Investments, Ltd., supra,* 207 Cal.App.3d 1018. There, the junior lienholder claimed that the trustee, which was also a beneficiary under a deed of trust, conspired "to conduct the sale in a manner calculated to 'chill the bidding' and [to] permit [it] to purchase the property at lower than market value and to cause [the junior lien holder] to lose its security interest." (*Id.* at p. 1020.) In particular, the plaintiff claimed that the obligation due was misrepresented to be more than three times greater than the amount owed. Plaintiff contended ". . . its damage was caused by dissuading others from bidding an amount at the foreclosure sale that could pay off the indebtedness caused by the default at a 'fair market value' which, in turn, would also pay off its own junior lien. By alleging the total indebtedness due [as over $800,000] instead of only

[$226,000], the only lien in default, fewer prospective purchasers were likely to be interested in attending the sale because of the considerable difference in cash required to purchase the property." (*Id.* at p. 1022.) Based upon these allegations, the plaintiff sued various individuals and entities for "breach of agency by [the] trustee, self-dealing, conspiracy, fraud, unjust enrichment, and constructive trust arising out of a foreclosure sale."[9] (*Id.* at p. 1020.)

The Court of Appeal rejected the argument that the plaintiff's only remedy was to sue to set aside the foreclosure sale. It reasoned that if a junior lienholder was precluded from suing for fraud or other misconduct, "fraudulent conduct to 'chill the bidding' or other misconduct resulting in the 'washing out' of junior liens would be completely insulated from suit." (207 Cal.App.3d at p. 1022.)

The above analysis essentially parallels the conspiracy theory South Bay alleged in its complaint and proved at trial. That is, South Bay alleged and proved that Riviera and Archer agreed that no one except Riviera would be permitted to purchase at the foreclosure sale.[10] To effectuate that goal, the first two sales were postponed when other bidders—apparently ready, willing, and able to purchase—appeared.[11] In addition, to dissuade any potential bidders, Riviera knowingly allowed the trustee to misrepresent by approximately $100,000 the amount in default. Although Hanaway testified the error was inadvertent, Archer testified Hanaway had intentionally engineered the situation.[12] These facts, if credited by the jury, constitute substantial evidence of wrongful conduct.

South Bay also proved damages, the element the plaintiff failed to prove in *FPCI RE-HAB 01* v. *E & G Investments, Ltd., supra,* 207 Cal.App.3d 1018. In the latter matter, the reviewing court held: "In order to prove it was damaged by the irregularities in the foreclosure sale which dissuaded or prevented a higher bid, the junior lienor would have to produce a ready,

---

[9]The opinion does not recite with specificity the allegations in the complaint.

[10]On this appeal, Riviera's brief states: "Riviera's self-interest in the foreclosure sale was to have competitive bidding, so that the amount of the winning bid would be as high as possible. The higher the bid, the more that Riviera's loss would be mitigated." We note, however, that none of Riviera's agents or owners testified to that "fact" at trial. In any event, it is for the jury to determine Riviera's motive and intent in regard to the foreclosure sale(s).

[11]Riviera correctly notes that Civil Code section 2924g, subdivision (c)(1) permits the trustee's sale to be postponed three times. That statutory provision is not dispositive given the evidence about the reason for the postponements and the presence of bidders ready and willing to purchase the property.

[12]This conflict in the evidence establishes that Riviera errs in stating in its brief that "the uncontradicted testimony of Riviera officer Robert Hanaway was that the wrong amount of James Archer's debt was communicated by Riviera to the trustee by mistake . . . ."

willing and able buyer who would have paid the higher price but for the wrongful conduct. Otherwise, damages alleged would be speculative." (*Id.* at p. 1023.) The Court of Appeal then affirmed the summary judgment because the plaintiff had been unable to prove that anyone "was ready, willing and able to purchase the property for cash sufficient to both pay off [the senior lien] and provide a surplus as well." (*Id.* at p. 1024.) Here, on the other hand, South Bay did make the requisite showing. It established through the testimony of Hanaway and Archer and documentary evidence (see fn. 2, *ante*), that Ronald Pole was present at the December 31, 1991, foreclosure sale with a $225,000 cashier's check and ready to purchase the property.

Riviera's appellate assertion that "there was no evidence that [South Bay] suffered any damage from [defendants'] actions" is simply incorrect. Riviera relies upon the fact that *it (Riviera)* ultimately suffered a financial loss when it sold Archer's property to a third party. This is a nonsequitur. The point is that as a result of the foreclosure sale, South Bay's lien was extinguished and it never received any payment on its debt.

In sum, South Bay offered substantial evidence to establish liability. While the evidence did not support the theory that defendants made a misrepresentation to South Bay upon which South Bay detrimentally relied, the evidence supported a theory of liability based upon a violation of Civil Code section 2924h, subdivision (g). ■ "A tort in essence is the breach of a nonconsensual duty owed another. Violation of a statutory duty to another may therefore be a tort and violation of a statute embodying a public policy is generally actionable even though no specific civil remedy is provided in the statute itself. Any injured member of the public for whose benefit the statute was enacted may bring the action. [Citations.]" (*Laczko* v. *Jules Meyers, Inc.* (1969) 276 Cal.App.2d 293, 295 [80 Cal.Rptr. 798]; accord, *Michael R.* v. *Jeffrey B.* (1984) 158 Cal.App.3d 1059, 1067 [205 Cal.Rptr. 312]; see also Civ. Code, § 1708 ["Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."].)

■ Civil Code section 2924h, subdivision (g) criminalizes "any act . . . which would operate as a fraud or deceit upon any beneficiary . . . or junior lienor . . . ." South Bay established the requisite fraudulent conduct: the agreement between Riviera and Archer to postpone the foreclosure sales; the postponements of the sale because bidders ready and able to purchase were present; and the misrepresentation about the amount owed to Riviera. South Bay, as a junior lienholder, clearly falls with the class for whose

benefit the statute was enacted and therefore may use defendants' violation of the statute to establish civil liability.[13]

The operative facts supporting the theory of liability created by statute were set forth in South Bay's complaint: continuing the sale to prevent others from bidding and falsely inflating the amount owed on Riviera's lien. The evidence on this issue came from defendants (Hanaway and Archer). Consequently, defendants cannot claim surprise or prejudice about defending against this theory upon retrial. The trial court therefore must permit South Bay to amend its complaint to allege this theory.

■ In addition, we find that the trial court erred in denying South Bay's request to amend its complaint to plead a cause of action for money due under Civil Code section 2924k, subdivision (a), the text of which is set forth *ante* at footnote 6. In essence, South Bay urged that the trustee had breached its statutory duty to collect from Riviera the *full amount* of its bid and distribute the excess to it as a junior lienholder. The claim is well taken because, as conceded by Hanaway's testimony, the trustee acted as Riviera's agent in conducting the sale. The evidence is reasonably susceptible to the inference that Riviera directed the trustee to ignore the fact that Riviera had placed a bid exceeding the amount owed to it and therefore to not collect from Riviera the excess amount and distribute it to South Bay. The trustee's failure to perform its statutory obligation can be imputed to Riviera based upon the agent-principal relationship. "Since the trustee acts as an agent for the beneficiary, there can be no question that liability for damages may be imposed against the beneficiary where, as here, the trustee in exercising the power of sale is acting as the agent of the beneficiary. [Citations.]" (*Munger* v. *Moore* (1970) 11 Cal.App.3d 1, 8 [89 Cal.Rptr. 323].)

■ "A pleading may be amended at the time of trial unless the adverse party can establish prejudice. [Citation.] Where a party is allowed to prove facts to establish one cause of action, an amendment which would allow the same facts to establish another cause of action is favored, and a trial court abuses its discretion by prohibiting such an amendment when it would not prejudice another party. [Citations.] A variance between pleading and proof does not justify the denial of an amendment to conform pleading to proof unless the unamended pleading 'misled the adverse party to his prejudice in maintaining his action or defense upon the merits.' [Citations.]" (*Brady* v. *Elixir Industries* (1987) 196 Cal.App.3d 1299, 1303 [242 Cal.Rptr. 324].)

---

[13]Prior to oral argument, this court directed the parties to be prepared to address various issues, including the question whether Civil Code section 2924h, subdivision (g) created civil liability. At the hearing conducted on the appeal, counsel for both parties were afforded the opportunity to address this point. (See Gov. Code, § 68081.)

We therefore reverse the judgment to permit South Bay to amend its complaint to include the two theories set forth above and to proceed to trial on that new pleading.[14]

### DISPOSITION

The judgment is reversed and the trial court is directed to proceed in accord with the views expressed herein. Appellant to recover costs.

Epstein, J., and Hastings, J., concurred.

---

[14]Our decision to reverse the trial court's judgment necessarily leads to a denial of defendants' request to impose sanctions upon South Bay for filing what defendants (incorrectly) characterize as a frivolous appeal.