Filed 9/11/20 Banks v. Wells Fargo Bank, N.A. CA1/1
Opinion on rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JAMES D. BANKS,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>WELLS FARGO BANK, N.A. et al.,<br><br>     Defendants and Respondents. | A156501<br><br>(San Francisco City & County<br>Super. Ct. No. CGC18564504) |

Plaintiff James D. Banks appeals from a judgment of dismissal following the sustaining of demurrers to his second amended complaint without leave to amend. This case arises from the confluence of several events—the death of Banks' mother which triggered the right of Wells Fargo Bank to foreclose on the "reverse mortgage" she had obtained and secured through a deed of trust on the property in dispute, and Banks' subsequent quiet title action against his siblings based on his claim that he once jointly owned the property with his mother and, at the time she obtained the reverse mortgage, she promised to leave the property to him in her will (a claim on which he was eventually successful).

After issuing an opinion affirming the judgment, we granted Banks' petition for rehearing as to his "wrongful foreclosure" and quiet title causes of action. Wells Fargo and Courthouse Ventures, in accordance with this

1

Court's order, filed supplemental briefs, as did Banks.[1] We again affirm the judgment as to Wells Fargo. We reverse the judgment as to the remaining defendants to allow Banks an opportunity to amend.

**BACKGROUND[2]**

*Prior Lawsuit*

In 1974, Banks and his mother purchased the San Francisco property at issue, taking title as joint tenants. Banks then moved out of the area. On retiring, he returned in 2003, moving in with his mother to be her caretaker. The following year, he and his mother looked into a "reverse mortgage." Wells Fargo advised that, given Banks' age (then less than 62 years old), if he remained on the title, it could not provide such a mortgage. Banks transferred his interest to his mother. She, in turn, orally promised to bequeath the property to him by will.

Wells Fargo and his mother then entered into a reverse mortgage agreement in early 2005, and over the years she borrowed slightly more than $200,000. His mother, however, failed to prepare the anticipated will prior to her death in 2014 and died intestate.

Under the deed of trust securing the loan, payoff was required when the borrower died and the property securing the loan was not the principal

---

[1] Respondents also filed requests for judicial notice, which we hereby grant. We deny Banks's third request for judicial notice.

[2] Given that this is an appeal from a dismissal following the sustaining of a demurrer without leave to amend, we summarize the facts alleged in the operative complaint and matters properly subject to judicial notice. (See *Sims v. Kernan* (2018) 30 Cal.App.5th 105, 109–110 (*Sims*) [" ' "When reviewing an order sustaining a demurrer without leave to amend, this court must treat the demurrer as admitting all properly pleaded facts, but not contentions, deductions or conclusions of fact or law." ' "]; *Scott v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 751 ["a demurrer may be sustained where judicially noticeable facts render the pleading defective"].)

2

residence of at least one surviving borrower. On the occurrence of such event, the deed of trust authorized the lender to invoke the power of sale and hold a foreclosure sale. Wells Fargo contacted Banks about the mortgage loan and allegedly advised Banks he could request an extension to repay the loan and if his mother's estate was in probate, the bank could request an extension from the Department of Housing and Development (HUD) before foreclosure commenced.

Banks submitted the documentation Wells Fargo requested and asked for forbearance of acceleration and foreclosure. He advised the bank he intended to gain full ownership of the property through the probate court and thereafter would refinance the property and pay off the Wells Fargo loan. Wells Fargo allegedly told him HUD had approved an extension through mid-September 2015, and that subsequent extension requests would be considered on submission of additional documentation.

Rather than working with Banks to obtain a further delay of foreclosure, Wells Fargo, in mid-September, proceeded to exercise its right to foreclose and referred the loan to First American Title for commencement of foreclosure proceedings. Banks appealed through the Wells Fargo internal review process but was told no further extensions were possible and his only alternative was to pay off the loan. He did not do so, and a notice of trustee's sale was recorded in January 2016.

In the meantime, instead of prosecuting his claim of ownership of the property through the probate court, Banks filed a quiet title action against his siblings, claiming to be the sole owner of the property. Following the recording of the notice of trustee's sale, Banks filed a complaint against First American seeking injunctive relief to prevent the foreclosure sale until his quiet title claims against his siblings were resolved. The trial court issued a

temporary restraining order, but shortly denied his request for a preliminary injunction.

Several months later, Banks filed an amended complaint, adding Wells Fargo as a defendant. Banks claimed Wells Fargo had entered into an "implied contract" to postpone foreclosure pending requests to HUD for extensions. The trial court again issued a temporary restraining order, but denied preliminary injunctive relief, ruling Banks had not shown likelihood of success on the merits.

Banks and Wells Fargo then engaged in settlement discussions over the course of about three months, during which Wells Fargo was excused from filing a responsive pleading and refrained from moving forward with a foreclosure sale. During these discussions, in a "third and final" settlement offer, Wells Fargo offered to postpone the sale until mid-December. The parties did not settle. Banks refused to do so because he was concerned the quiet title trial, set for mid-November, might be continued and because he was not comfortable with some of the terms Wells Fargo required in a release.

Settlement discussions having failed, Wells Fargo demurred to the first amended complaint. It maintained Banks lacked standing to interfere with the foreclosure sale and further maintained it had made no promise to Banks to further delay the sale. Banks moved to strike the demurrer on numerous grounds, including because it was "a sham" as the parties had reached a "[c]onditional" settlement.

The trial court denied Banks' motion to strike, the court's minutes stating Wells Fargo had properly interposed a demurrer in light of the parties "failed settlement negotiations." (Capitalization omitted.) The court ordered the prevailing party, i.e., Wells Fargo, to prepare a written order in

4

accordance with California Rules of Court, rule 3.1312(b). Banks maintains Wells Fargo failed to prepare the order "prior to the deadline set by the court."

As for Wells Fargo's demurrer, the court continued the hearing for a month, until December, observing that it "appears that [Banks] is considering a dismissal" and authorizing Banks to "file a dismissal in lieu of opposition" to the demurrer.

Banks choose to file a dismissal with prejudice. At this point, the quiet title claims against his siblings were set for trial in mid-December and the foreclosure sale was set for early January 2017.

Trial on his quiet title claims was continued again, to early February. In February, after a quarter day of trial, Banks obtained judgment on his claims.[3]

In the meantime, the foreclosure sale proceeded, and the property was sold on January 31 to Courthouse Ventures Inc.

### The Present Lawsuit

A year later, in February 2018, Banks filed the instant case against Wells Fargo and Courthouse Ventures Inc. Each interposed a demurrer, which the trial court sustained with leave to amend.

In June, Banks filed a first amended complaint, adding four new defendants who allegedly had an interest in the property.[4] He alleged the same causes of action asserted in his original complaint. All defendants filed

---

[3] The judgment in the quiet title case reflects Banks had seven siblings. Only the personal representative of one, who was deceased, appeared for trial.

[4] Two of these individuals purchased the property from Courthouse Ventures Inc. The remaining two individual defendants provided a loan to the purchasers.

5

demurrers, which the court again sustained with a final opportunity to amend.

Banks filed a second amended complaint in September. He again re-alleged the causes of action in his original complaint—for "breach of implied contract," "breach of implied promise," "unjust enrichment," "wrongful foreclosure," and "quiet title." The quiet title cause of action was asserted only against Courthouse Ventures Inc. and the individual defendants.

All defendants again interposed demurrers, which the trial court sustained, this time without leave to amend. The court subsequently entered a judgment of dismissal.

## DISCUSSION[5]

All of Banks' causes of action are ultimately grounded on the claim Wells Fargo, by allegedly failing to timely prepare the court-requested written order denying his motion to strike in the prior lawsuit, and by virtue of its postponement of the foreclosure sale during settlement negotiations and its continued postponement during the motion to strike and demurrer proceedings in the prior lawsuit, made an "implied" settlement offer to further postpone the foreclosure sale until resolution of his quiet title action against his siblings, which he "accepted" by filing the dismissal.

As we explain, these allegations do not suffice to support any of Banks' five causes of action.

---

[5] We review a dismissal following the sustaining of a demurrer de novo, treating the demurrer as admitting all properly pleaded facts, and reading the complaint as a whole and giving it a reasonable interpretation. (*Sims, supra,* 30 Cal.App.5th at pp. 109–110.) Regardless of the label attached to a cause of action, we examine the well-pleaded factual allegations to determine whether they state a cause of action on any available legal theory. (*Id.* at p. 110.) We will affirm the sustaining of a demurrer if it is correct on any ground, regardless of the trial court's reasoning. (*Ibid.*)

6

***Breach of "Implied" Contract***

Banks' first cause of action is entitled, "Breach of Implied Contract." For there to be an enforceable contract, whether express or implied-in-fact, there must, among other things, be a mutual meeting of the minds. (See *Division of Labor Law Enforcement v. Transpacific Transportation Co.* (1977) 69 Cal.App.3d 268, 275 [a "vital element[] of a cause of action based on contract [is] mutual assent (usually accomplished through the medium of an offer and acceptance)" and is a requisite element of both express and implied-in-fact contracts].)

" 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' " (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208, quoting *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141, disapproved on another ground in *Reid v Google* (2010) 50 Cal.4th 512, 524; see *Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942–943 [existence of mutual consent "is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe"].)

Banks has not alleged conduct by Wells Fargo that can, under an objective standard, reasonably be understood as manifesting an intent to enter into a settlement agreement consisting of a promise by it to further postpone the foreclosure sale until the conclusion of Banks's quiet title action against his siblings, upon Banks' filing a dismissal.

As we have recited, Banks alleged he and Wells Fargo entered into settlement negotiations and during that period of time, Wells Fargo refrained from proceeding with the foreclosure sale and was excused from filing a

7

response to Banks' complaint.  During these negotiations, Wells Fargo offered to postpone the sale until mid-December.  Banks further alleged, however, that the parties did not reach a settlement, because he feared his quiet title case against his siblings would be continued past December and because he would not agree to Wells Fargo's required release language.  Wells Fargo therefore filed a responsive pleading, demurring to the complaint.  Banks responded with a motion to strike the demurrer, claiming he and Wells Fargo had reached a "[c]onditional" settlement.  Wells Fargo disputed this assertion, and the trial court denied Banks's motion, with the court's minutes stating Wells Fargo had properly interposed a demurrer given the parties "failed settlement negotiations."  (Capitalization omitted.)  The court then gave Banks the option of dismissing Wells Fargo or responding to its demurrer.  The court also asked Wells Fargo to prepare a written order for the court's signature, memorializing the court's ruling.

Banks' "implied" settlement theory is predicated *entirely* on Wells Fargo's alleged failure to timely submit the requested written order, which conduct he claims constituted an "offer" by Wells Fargo to further postpone the foreclosure sale until after the conclusion of his quiet title action against his siblings.  This simply is not a "reasonable meaning" that can be ascribed to Wells Fargo's alleged failure to prepare a written order at the trial court's directive and pursuant to the California Rules of Court.  And while Banks alleges *he* believed Wells Fargo's alleged failure to timely prepare the written order was such an offer in light of its postponement of the foreclosure sale during the parties' settlement negotiations and during the motion and demurrer proceedings, his subjective belief does not substitute for statements or conduct by Wells Fargo that could reasonably be understood to manifest assent to the "implied" settlement agreement Banks alleged.  (See *Stewart v.*

8

*Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587 ["[m]utual *assent* to contract is based upon objective and outward manifestations of the parties; a party's 'subjective intent, or *subjective consent,* therefore is irrelevant,' " italics added].)

For this reason, alone, Banks failed to sufficiently allege the requisite elements of a cause of action for breach of implied contract, and Wells Fargo's demurrer to this cause of action was properly sustained.[6]

### Breach of "Implied Promise"

To the extent Banks' second cause of action entitled "Breach of Implied Promise" is a recycling of his breach of implied contract theory, his allegations are insufficient for the reason we have discussed above.

To the extent this cause of action is one for "promissory estoppel," as Banks suggests in his appellate briefing, his allegations are likewise deficient for the reason we have discussed in connection with his breach of implied contract cause action. "[E]xcept for its equitable nature and the lack of a necessity for consideration, promissory estoppel claims are akin to contract actions." (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 903.) Promissory estoppel substitutes reliance on a promise as a substitute for bargained-for consideration. (*Fleet v. Bank of America N.A.* (2014) 229 Cal.App.4th 1403, 1412–1413 (*Fleet*).) Thus, just as a breach of contract claim must be based on an express promise, or on conduct that reasonably is understood to convey such a promise, so too must an equitable estoppel claim seeking to enforce the asserted promise. (See *US Ecology,* at p. 904 ["promissory estoppel claims are aimed solely at allowing recovery in equity where a contractual claim fails for a lack of consideration, and in all other

---

[6] We therefore need not, and do not, reach any of the other grounds Wells Fargo urges in support of affirmance.

9

respects the claim is akin to one for breach of contract"].) As we have discussed above, Banks has not alleged conduct by Wells Fargo that reasonably could be understood as evidencing a promise to further postpone the foreclosure sale until resolution of Banks's quiet title action against his siblings on Banks's filing of a dismissal.

Additionally, "a cause of action for promissory estoppel is inconsistent with a cause of action for breach of contract based on the same facts." (*Fleet, supra,* 229 Cal.App.4th at p. 1413.) Only " '[w]hen a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations.' " (*Ibid.*; accord, *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2016) 6 Cal.App.5th 1207, 1224–1225.) Here, Banks' original and amended complaints reflected no "doubt" as to the conduct he claims gave rise to an implied settlement agreement. On the contrary, he consistently, and specifically, identified the conduct by Wells Fargo on which he based his breach of implied contract claim. Accordingly, for this reason as well, he failed to allege a viable promissory estoppel cause of action.[7]

### *Unjust Enrichment*

As for Banks' third cause of action for "Unjust Enrichment," there is no independent cause of cause of action in California for unjust enrichment. " 'The phrase "Unjust Enrichment" does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.' (*Lauriedale Associates, Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448. . . .) Unjust enrichment is ' "a general principle,

---

[7] Thus, we need not, and do not, reach any of the other grounds Wells Fargo urges in support of affirmance.

underlying various legal doctrines and remedies," ' rather than a remedy itself.  (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1315 . . . .)  It is synonymous with restitution.  (*Id.* at p. 1314.)"  (*Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793 (*Melchior*).)

Banks correctly points out that in a recent opinion issued by a different division of this Court, the court commented "this Appellate District appears split" on whether unjust enrichment stands as an independent cause of action.  (*O'Grady v. Merchant Exchange Productions, Inc.* (2019) 41 Cal.App.5th 771, 791.)  The court went on to explain, however, that the nomenclature is essentially irrelevant, as this district, as does every other, equates a claim for "unjust enrichment" as a claim for "restitution."  (*Ibid.*; see, e.g., *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1132; *Melchior, supra,* 106 Cal.App.4th at p. 793.)

And regardless of whether a separate "claim" can be made for restitution, "restitution is a *remedy* and not a freestanding cause of action" (*Reid v. City of San Diego* (2018) 24 Cal.App.5th 343, 362, italics added; *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 387 (*McBride*)), and must be sought in connection with a legally cognizable theory that can support restitutionary relief.  (*McBride,* at p. 387 [whether amended complaint claiming unjust enrichment and seeking restitutionary relief "was properly sustained depends . . . not on the nature of the damages [the plaintiff] seeks, but rather on the viability of the causes of action he has attempted to plead].)

*McBride*, decided by the same division of our court that decided *O'Grady*, explained, "[t]here are several potential bases for a cause of action seeking restitution. For example, restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason.  (See

11

generally 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, §§ 148–150, pp. 218–220; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 112, 118, pp. 137–138, 142–144.) Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct. In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory (an election referred to at common law as 'waiving the tort and suing in assumpsit'). (See, e.g., *Murrish v. Industrial Indemnity Co.* (1986) 178 Cal.App.3d 1206, 1209 . . . [election to waive tort and sue in assumpsit is a fiction that broadens remedies available to plaintiff, but does not create a contract where none existed]; see generally 55 Cal.Jur.3d (May 2004) Restitution and Constructive Contracts, § 21.) In such cases, where appropriate, the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment. (See generally 1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 91, 95–96, 99–110, 116, pp. 122–123, 125–126, 128–136, 140–141; 3 Witkin, Cal. Procedure, *supra,* Actions, § 160, pp. 229–230; see also 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 517, pp. 607–608 [discussing use of common count to seek quasi-contractual restitution in lieu of tort damages].)" (*McBride, supra,* 123 Cal.App.4th at p. 388.)

In *McBride,* the court pointed out the plaintiff had "abandoned" any contract claim, and therefore examined his allegations to determine whether any supported a quasi-contractual or assumpsit theory of recovery based on the defendant's allegedly tortious conduct. *(McBride, supra,* 123 Cal.App.4th

12

at pp. 388–389) and concluded, largely for public policy reasons, that they did not.[8] (*Id.* at pp. 389–395.)

Here, in contrast, Banks never "abandoned" his contract claim. On the contrary, he consistently pleaded that he and Wells Fargo entered into an implied agreement. Nor did he ever allege this implied agreement "is unenforceable or ineffective for some reason" (*McBride, supra,* 123 Cal.App.4th at p. 388), necessitating recovery through a quasi-contractual claim and restitution.

Furthermore, Banks' allegations do not support quasi-contractual recovery for "fraud, duress, conversion, or similar conduct" such that restitution would be warranted to avoid "unjust enrichment." As we have discussed, he has not alleged any conduct by Wells Fargo that could reasonably constitute a promise to further postpone the foreclosure sale on which Banks could reasonably rely. In short, Banks' allegations do not allege a circumstance where Wells Fargo's conduct, by any reasonable measure, induced an injustice. (See *McBride, supra,* 123 Cal.App.4th at p. 389 [restitution is available only if " 'the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it.' "]; see also *Tindell*

---

[8] The plaintiff in *McBride* had been told by the defendant he was the father of her child, and he therefore returned to the United States from South America, found employment and began supporting defendant and the child. Eventually, the plaintiff and the defendant switched roles; defendant returned to work and plaintiff stayed at home caring for the child. The defendant subsequently decided to move, took the child with her, and limited the plaintiff's visitation. The plaintiff sued to establish paternity and for custody. When testing showed he was not the biological father, he sued the defendant for misrepresentation and unjust enrichment, seeking return of sums he had paid for support. The trial court sustained the defendant's demurrer; the Court of Appeal affirmed. (*McBride, supra,* 123 Cal.App.4th at pp. 382–384.)

*v. Murphy* (2018) 22 Cal.App.5th 1239, 1250 [causes of action for "unjust enrichment, rescission, or restitution" properly dismissed where they were simply " 'derivative . . . [of] other causes of action' " as to which no sufficient factual bases were alleged].)[9]

### *Wrongful Foreclosure*

In his second amended complaint, Banks alleged that his fourth cause of action, for "wrongful foreclosure," was "derivative" of his first three causes of action, and in his opening brief on appeal he asserts the same. Because we have concluded Banks' first three causes of action fail to sufficiently allege a claim, his fourth, derivative cause of action, also necessarily fails. (See *Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 178 [where remaining causes of action are "incidental to and depend upon the validity (or invalidity) of the preceding claims for relief," their viability "depend[s] on the fate of the antecedent substantive causes of action"].)[10]

### *Quiet Title*

Banks' fifth cause for "quiet title" is asserted against Courthouse Ventures Inc., which purchased the property in 2017 at the foreclosure sale, and the two individuals who subsequently purchased the property in 2018 from Courthouse and the two individuals who funded that purchase.

A quiet title cause of action generally has two elements: (1) "the plaintiff is the owner and in possession of the land," and (2) "the defendant claims an interest therein adverse to [the plaintiff]."[11] (*South*

---

[9] We therefore need not, and do not, address the other grounds advanced by Wells Fargo and the other defendants for affirmance.

[10] Accordingly, we do not address the additional grounds advanced by Wells Fargo for affirmance.

[11] The courts have recognized an exception to the plaintiff as title owner where there has been a "void" foreclosure sale. In that context, the

*Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 740; see *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 802–803; Code Civ. Proc., § 761.020.)

Moreover, it is the general rule that the holder of equitable title cannot maintain a quiet title action against a legal owner. (See *G.R. Holcomb Estate Co. v. Burke* (1935) 4 Cal.2d 289, 297 ["[i]t has been repeatedly held in this state that an action to quiet title will not lie in favor of the holder of an equitable title as against the holder of a legal title"].) The limited exception permitting the holder of an equitable interest to maintain a quiet title action against a legal owner is relatively narrow and has been recognized primarily in cases involving fraud or breach of fiduciary duty by the holder of legal title. (See, e.g., *Strong v. Strong* (1943) 22 Cal.2d 540, 545–546 [equitable rights could not be established in quiet title action absent finding of fraud]; *Warren v. Merrill* (2006) 143 Cal.App.4th 96, 110–112 [quieting title in condominium purchaser where real estate agent breached fiduciary duty to purchaser by fraudulent procuring title to property]; see generally, 5 Witkin, Cal. Procedure (2020) Pleading, § 667 ["plaintiff who attacks the legal title on equitable grounds is in effect contending that the defendant obtained legal title by fraud or similar inequitable conduct, and must specifically allege the facts constituting that conduct"].)

At all relevant times—that is, after Banks conveyed his interest in the property to his mother until after the foreclosure sale—Banks could make no claim of holding legal title. Rather legal title was first held by his mother,

---

former homeowner may be able to bring a quiet title against the foreclosing entity and regain ownership of the property. (See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929–934.) While Banks alleged a "wrongful" foreclosure, he never alleged the foreclosure sale was "void" as that term has been defined by the courts. (See *ibid.*)

and after the foreclosure sale, by Courthouse Ventures Inc., and later, by the two individuals who purchased the property from Courthouse. That Banks ultimately prevailed on his quiet title claims against his siblings, did not alter the fact that, by then, Courthouse Ventures Inc. held title to the property. Accordingly, he could not then claim more than a beneficial ownership interest in the property.

Thus, to sufficiently allege a quiet title claim against Courthouse Ventures Inc. and its transferees, Banks was required to allege the kind of egregious conduct by the holders of legal title necessary to bring his quiet title cause of action within the limited exception discussed above. He did not so, and his allegations are therefore insufficient to support his cause of action for quiet title.

Banks maintains he alleged an alternative quiet title "theory" based on his "claim of an oral agreement between [Banks] and his mother dating to December 2004." Such agreement "pre-dated the Deed of Trust" and Banks thus alleged his claim "therefore was superior to it" and "therefore was not foreclosed by the trustee sale." Banks further alleged Courthouse Ventures Inc. had "constructive notice" of his "pre-Deed of Trust unrecorded ownership claim [i.e., the claim based on the oral agreement with his mother] by the lis pendens" he recorded at the outset of his quiet title action. According to Banks, Courthouse thus "took its trustee deed subject to the judgment" subsequently entered in his quiet title action. Banks further alleged that because the sale to Courthouse "extinguished" the Deed of Trust securing the reverse mortgage, the language of the quiet title judgment expressly making his newly confirmed title subject to the Deed of Trust, was rendered "a legal nullity." Banks thus alleged the trustee deed conveying the property to Courthouse Ventures Inc. was "void."

16

This "theory" is unavailing for at least two reasons.  First, Banks' assertion that the oral promise by his mother was first in time and therefore superior to the Wells Fargo deed of trust is incorrect.  The first in time priority rule applies only to properly recorded interests in real property.  (See generally *Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1099.)  The alleged oral promise by his mother to bequeath the property to him is not an ownership interest.  At most, Banks had an expectancy of an ownership interest in the future.

Second, because the Wells Fargo deed of trust was properly recorded, it secured the priority of not only its ownership interest, but also the priority of its successor's ownership interest.  As the court explained in *Dover Mobile Estates v. Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498: "Title conveyed by a trustee's deed relates back to the date when the deed of trust was executed.  (*Bank of America v. Hirsch Merc. Co.* (1944) 64 Cal.App.2d 175, 184 . . . .)  The trustee's deed therefore passes the title held by the trustor at the time of execution.  (*Hohn v. Riverside County Flood Control etc. Dist.* (1964) 228 Cal.App.2d 605, 612, [superseded by statute on another ground as stated in *Miller v Provost* (1994) 26 Cal.App.4th 1703, 1707–1708]. . . .)."  Accordingly, Courthouse Ventures took the title held by Wells Fargo at the time Banks' mother executed the deed of trust—title that was unencumbered by any subsequent ownership claim by Banks.  The same goes for the title Courthouse conveyed to individual defendants.

### Leave to Amend

In his petition for rehearing, Banks asserted he could amend to state a "wrongful foreclosure" claim against Wells Fargo and quiet title claims against Courthouse Ventures and the subsequent purchasers and their lenders.  In his supplemental briefing, Banks maintains he can amend to

17

assert both "wrongful foreclosure" and quiet title claims against all respondents.

### *Wrongful Foreclosure*

After considering the parties' supplemental briefing and respondents' requests for judicial notice, we conclude Banks has failed to show that he can amend to allege a viable "wrongful foreclosure" claim against Wells Fargo.

The matters which we have judicially noticed show the following:  After purchasing the house formerly owned by Banks' mother at the foreclosure sale, Courthouse Ventures instituted an unlawful detainer action against Banks.  Banks subsequently sought leave to amend his answer to add an " 'unclean hands' " defense, alleging Courthouse Ventures "is supported by tainted profits" because its principal, Mohammed Rezaian, has funded the company through his "participation in an illegal bid-rigging scheme."  More specifically, he alleged Rezaian participated in such a scheme between 2008 and 2011 and used the illegal profits to support Courthouse Ventures' "activities."  Banks' affirmative defense did not allege bid-rigging in connection with the purchase of his mother's house.  Nor did it allege that Wells Fargo had anything whatsoever to do with Rezaian's conduct.  Banks' memorandum in support of amending his answer was to the same effect— that his new defense was based on Rezaian's prior bid-rigging scheme and his alleged use of profits derived therefrom to purchase the property at issue.

After Courthouse Ventures sold the property to Xiaowen Li and Yong Liang, they substituted in as plaintiffs in the unlawful detainer action, and Banks filed a second amended answer, re-alleging his "unclean hands" defense.

According to the counter proposed statement Banks submitted in connection with the subsequent appeal (to the superior court appellate

18

division) in the unlawful detainer case, he testified at the unlawful detainer trial as follows: He "became aware by internet research and newspaper accounts of Courthouse Ventures' involvement though Mohammed Rezaian in a bid-rigging conspiracy scandal that was [then] currently under prosecution in San Francisco federal court." His "understanding" of this conspiracy, based on his online research and court documents, was that "investors at foreclosure sales in San Francisco some time ago had banded together to conspire to keep auction prices at foreclosure sales from being bid up to levels they felt would prevent them from making acceptable profits on their purchase, fix-up and resale of foreclosed properties." "[T]he party [that the conspiracy] selected to be the winning bidder paid off the other bidders to stop bidding at a certain point." Because three of the individuals involved in the conspiracy were also involved in the purchase of the property at issue, Banks "developed a strong belief that bidding" on his mother's house also "had been rigged."

The verdict form asked the unlawful detainer jury to answer two questions: (1) Did the plaintiffs establish Banks no longer had any right to occupy the premises? and (2) Did Banks prove Courthouse Ventures acquired title by engaging in illegal bid-rigging or by using funds obtained from illegal bid-rigging? The jury answered "yes" to *both* questions.

The unlawful detainer plaintiffs (Courthouse Ventures and the new individual owners) filed post-trial motions challenging the validity of Banks' "unclean hands" defense. Banks maintained the defense was viable, pointing out that Rezaian's two co-conspirators had been convicted of engaging in buyer side bid-rigging. Rezaian entered a plea deal whereby he testified against these two individuals in exchange for immunity from prosecution.

19

During the hearing on the post-trial motions, the trial court stated it believed the use of funds from a criminal enterprise could provide a legal basis for an unclean hands defense and that Banks' evidence was sufficient to suggest Courthouse Ventures had in fact used such funds to purchase the property in question. The court also stated, several times, Banks had not presented "substantial evidence that there was bid rigging as to this property." Nevertheless (and inexplicably), the court signed a written order prepared by Banks that states "there was substantial evidentiary support for both aspects" of Banks' affirmative defense.

Suffice it to say, the unlawful detainer appeal, which remains pending, focuses on whether either prong of Banks' "unclean hands" defense is legally viable, and, if so, whether there is any substantial evidence supporting either the use of ill-gotten profits or buyer side bid-rigging in connection with Courthouse Ventures' purchase of the property in question.

As Wells Fargo points out, Banks never alleged in the unlawful detainer action that the bank had anything to do with the *buyer's side* bid-rigging for which Rezaian and his cohorts were prosecuted. Likewise, none of the judicially noticed materials so much as mention Wells Fargo. In short, none of these documents suggest in any way that Wells Fargo was not entitled to proceed with a foreclosure sale to satisfy what was owed under the reverse mortgage or that it engaged in any sort of impropriety in connection with the sale. Accordingly, Banks has failed to demonstrate that he can amend his cause of action for "wrongful foreclosure" to state a viable claim against the bank.

Indeed, as Wells Fargo points out, *Lo v. Jensen* (2001) 88 Cal.App.4th 1093 (*Lo*), confirms that Banks can pursue a remedy for any alleged buyer side bid-rigging against the malfeasing buyer and need not involve Wells

Fargo. In that case, a condominium owner's association foreclosed on one of the condominiums. Two buyers, who were "experienced competitors," agreed to purchase the condominium together, rather than bid against each other, in order to hold down the purchase price. (*Id.* at pp. 1095-1096.) "At the sale, all statutory notice requirements were fulfilled and the sale itself was regularly conducted." (*Id.* at p. 1096.) But because the buyers unlawfully conspired not to bid against each other to depress the price, the trial court concluded the former owners should be able to reclaim title *from the conspiring buyers*. (*Id.* at p. 1097.) The trial court thus ordered the buyers to deliver a quitclaim deed to the former owners, contingent on the former owners' tender of the amount of the debt. (*Id.* at p. 1099.) This relief was ordered without any involvement on the part of the foreclosing condominium owners association. (See *id.* at pp. 1096, 1099.) The Court of Appeal affirmed. (*Id.* at p. 1099.)

Accordingly, whatever rights Banks might otherwise have in connection with his claim of buyer side bid-rigging, he does not have any right to proceed against Wells Fargo Bank for "wrongful foreclosure."

In urging that we should disregard *Lo,* Banks relies on two "wrongful foreclosure" cases. The first is *Washington Mutual Bank v. Blechman* (2007) 157 Cal.App.4th 662. In that case, after Blechman acquired title to the property at issue, he took out a loan on which he subsequently defaulted. (*Id.* at p. 665.) After he connived to delay the nonjudicial foreclosure sale nine times, the property was finally sold to an entity, Gladmac. (*Ibid.*) Blechman then sued the bank, the trustee and Gladmac to set aside the sale. Before the court ruled on demurrers by the bank and trustee, Blechman dismissed them. He then procured a default judgment against Gladmac invalidating the sale and proceeded to re-encumber the property. (*Id.* at pp. 665-666.)

Washington Mutual and the trustee, in turn, sued for declaratory relief that the trustee's sale was valid. (*Id.* at p. 666.) The trial court granted declaratory relief, and Blechman appealed, claiming the default judgment precluded re-litigation of the validity of the sale. (*Id.* at pp. 666-667.) The Court of Appeal affirmed, explaining the bank and trustee were indispensable parties to the prior case challenging the foreclosure sale, and Blechman's dismissal in that case rendered the default judgment a nullity. (*Id.* at pp. 668-669.)

The second case is *Majd v. Bank of America, N.A.* (2015) 243 Cal.App.4th 1293. The plaintiff in that case also challenged a foreclosure sale, asserting "irregularities" in the securitization process and " 'dual tracking' " (i.e., that the foreclosure sale occurred while his loan modification application was still under review). (*Id.* at pp. 1297-1298.) The trial court sustained demurrers without leave to amend. (*Id.* at p. 1300.) The Court of Appeal reversed, rejecting the plaintiff's securitization theory but concluding he had adequately alleged a variety of claims based on "dual tracking." (*Id.* at pp. 1302-1304, 1306-1307.) As to the plaintiff's cause of action for cancellation of the trustee's deed, the court concluded his claim was deficient for failure to join the purchaser, but this was a matter that could be remedied by amendment. (*Id.* at pp. 1308-1309.)

In short, the circumstances in *Washington Mutual* and *Majd* are not similar to those in *Lo*, and neither case detracts from the equitable remedy that *Lo* recognized may lie in a case where there has been unilateral malfeasance on the part of the purchaser at a foreclosure sale. Indeed, Banks does not dispute in his response to Wells Fargo's supplemental brief that *Lo* sets forth a viable remedy for buyer side collusion at a foreclosure sale. He maintains, however, that the bank should be compelled to remain as a

defendant because he wants to "erase" the trustee's deed from the "chain of title" going back to the point at which he obtained a quiet title judgment against his siblings. However, we see no reason why *Lo* would not provide an adequate remedy.

For the first time in his reply to the supplemental brief filed by Courthouse Ventures, and the subsequent purchasers Xiaowen Li and Yong Liang and their lenders Joseph and Beverly Giraudo, Banks maintains he can allege an "alternative theory" of "lender liability" against Wells Fargo. (Capitalization and boldface omitted.) This theory is predicated on a claim the bank "knew or should have known of widely reported announcements of federal investigations of alleged bid-rigging conspiracies operating in San Francisco and nearby areas at or about the time of the trustee sale" of the property in question. He cites no authority, however, supporting such a "duty" owed to the title owner of a property, let alone, to someone, as was Banks, with, at best, an equitable interest in the property.

Although Banks' "wrongful foreclosure" cause of action, as pled in each of his complaints, was directed against Wells Fargo ("derivative," as it was, of his breach of implied contract and breach of implied promise causes of action), he now maintains he can also allege such a claim against Courthouse Ventures, and the subsequent purchasers Xiaowen Li and Yong Liang and their lenders Joseph and Beverly Giraudo based on bid-rigging allegations. However, absent any allegations that implicate the foreclosing lender, we are unaware of any authority under which Banks can pursue a "wrongful foreclosure" claim solely against the buyer.

### Quiet Title

As to Courthouse Ventures, and the subsequent purchasers Xiaowen Li and Yong Liang and their lenders Joseph and Beverly Giraudo, we conclude

23

the matters which we have judicially noticed suggest Banks should be allowed an opportunity to amend his complaint.

As *Lo* indicates, a court sitting in equity is empowered to provide a remedy where there has been buyer side collusion to suppress the bidding at a foreclosure sale. (*Lo, supra,* 88 Cal.App.4th at pp. 1097-1099; see *South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.* (1999) 72 Cal.App.4th 1111, 1114, 1122 (*South Bay*) [reversing denial of leave to amend to conform to proof where evidence indicated defaulting owner and first priority lender colluded to deter other bidders so lender could purchase at foreclosure sale].) We emphasize we are concluding only that Banks is entitled to an opportunity to amend. We are making no pronouncement as to whether any such amendment will withstand further challenge.

Pointing to the jury's verdict in the unlawful detainer action—that Li and Liang "prove[d] all four elements" of their unlawful detainer claim (which included that they are the owners of the property) and Banks "no longer has any right to occupy" the property—Courthouse Ventures, Li and Liang, and the Giraudos maintain, at one point in their supplemental brief, that this verdict prevents Banks from alleging a viable quiet title action against them. However, elsewhere in their brief, they acknowledge the unlawful detainer judgment is on appeal to the superior court appellate division and therefore has no arguable preclusive effect at this juncture.[12]

Furthermore, even if the unlawful detainer judgment were not on appeal, there is a serious question whether that verdict—rendered in a proceeding of limited scope and heard by a court of limited jurisdiction—

---

[12] To the extent Courthouse Ventures, Li and Liang, and the Giraudos rely on the arguments they are advancing in their appeal of the unlawful detainer judgment, these efforts are wholly misdirected. We also decline their invitation to ask that that appeal be transferred to this court.

24

should be given any such preclusive effect. There are also serious questions as to whether, or how, the two jury verdicts—on the one hand, that Li and Lang proved up their claim for unlawful detainer, and, on the other hand, that Courthouse Ventures engaged in bid-rigging or used ill-gotten gains therefrom—can be harmonized and/or implemented. And finally, as *Lo* and *South Bay* make clear, regardless of how such a claim is labeled, an action will lie for buyer-side bid-rigging. (*Lo, supra,* 88 Cal.App.4th at pp. 1097-1099 [equitable relief granted]; see *South Bay, supra,* 72 Cal.App.4th at pp. 1121-1123 [damages recoverable].)

## DISPOSITION

As to Wells Fargo Bank, the judgment of dismissal is affirmed. As to Courthouse Ventures, and the subsequent purchasers Xiaowen Li and Yong Liang and their lenders Joseph and Beverly Giraudo, the judgment is reversed to allow Banks an opportunity to amend. Parties to bear their own costs on appeal.

_____
Banke, J.

We concur:

_____
Margulies, Acting P.J.

_____
Sanchez, J.

A156501, Banks v. Wells Fargo Bank

26